Rebecca Peterson-Fisher (SBN 255359)
Jennifer L. Liu (SBN 279370)
C. Leah Kennedy (SBN 346306)
**LIU PETERSON-FISHER LLP**
1204 Burlingame Ave., Suite 3
Burlingame, CA 94010
Tel: 650.461.9000
Fax: 650.460.6967
Email: rpf@liupetersonfisher.com
jliu@liupetersonfisher.com
lkennedy@liupetersonfisher.com

Danielle E. Leonard (SBN 208201)
Connie K. Chan (SBN 284230)
Robin S. Tholin (SBN 344845)
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: 415.421.7151
Fax: 415.362.8064
E-mail: dleonard@altshulerberzon.com
cchan@altshulerberzon.com
rtholin@altshulerberzon.com

Michelle Banker*
Alison Tanner*
Noel León*
Sudria Twyman*
Sunu Chandy*
**NATIONAL WOMEN'S LAW CENTER**
1350 I Street NW, Suite 700
Washington, DC 20005
Tel: 202.588.5180
Email: mbanker@nwlc.org
atanner@nwlc.org
nleon@nwlc.org
stwyman@nwlc.org
schandy@nwlc.org

*Attorneys for Plaintiff and the Putative Class*          **Pro hac vice application forthcoming*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARA BERTON, on behalf of herself and all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>AETNA INC. and AETNA LIFE INSURANCE COMPANY,<br><br>　　　Defendants. | CASE NO.: _____<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mara Berton ("Mara" or "Plaintiff"), by and through her attorneys, Liu Peterson-Fisher LLP, Altshuler Berzon LLP, and the National Women's Law Center ("NWLC"), on behalf of herself and others similarly situated, alleges, upon personal knowledge as to herself and information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.     Defendants Aetna Inc. and Aetna Life Insurance Company (together, "Aetna") intentionally discriminate on the basis of sex, specifically sexual orientation and gender identity, by denying equal access to fertility treatments covered by Aetna health plans to LGBTQ[1] plan members who want to become pregnant but cannot do so through sexual intercourse with their partner due to sexual orientation or gender identity.

2.     Aetna maintains and enforces a discriminatory infertility policy (Aetna Clinical Policy Bulletin No. 0327—Infertility (the "Infertility Policy")) that it incorporates into health plans nationwide that it designs, sells, or administers ("Aetna health plans") that provide fertility benefits. For those Aetna health plans, Aetna's Infertility Policy governs how plan members may access those covered treatments, and that Policy treats plan members differently based on sexual orientation and gender identity.

3.     Aetna, in its health plans nationwide, has created wholly unequal systems of fertility coverage which disadvantage LGBTQ members seeking to get pregnant who cannot do so through sexual intercourse because of their sexual orientation or gender identity or that of their partner, compared to heterosexual members seeking to get pregnant with their partner. Specifically, under Aetna's Infertility Policy, heterosexual members seeking to become pregnant are deemed eligible for fertility treatment coverage if the member simply states to a doctor that no pregnancy has resulted from frequent, unprotected heterosexual intercourse for six or 12 months, depending on the age of the person seeking treatment. However, LGBTQ members who want to become pregnant but cannot do so through sexual intercourse with their partner are deemed eligible for coverage only after submitting proof that they have undergone six or 12

---

[1] LGBTQ generally refers to individuals who are lesbian, gay, bisexual, transgender, queer, intersex, or non-binary.

cycles (depending on age) of arduous and expensive artificial insemination treatments—the very fertility treatments for which they seek coverage—which require substantial out-of-pocket costs and take far longer than six or 12 months to complete.[2]

4. While heterosexual couples are taken at their word, Class Members must expend additional time and thousands of dollars on the very fertility treatments for which they seek coverage to meet Aetna's threshold standard for any fertility treatment coverage. Undergoing six or 12 cycles of artificial insemination can be prohibitively expensive, particularly for LGBTQ individuals with limited financial resources (who are disproportionately people of color). Realistically, six to 12 timed cycles of insemination will also almost certainly take far longer than six to 12 months. In addition, undergoing more than six—let alone more than 12—cycles of intrauterine insemination ("IUI"), the most common form of artificial insemination, is often medically inadvisable. Thus, by erecting this discriminatory and egregiously burdensome "eligibility" barrier, Aetna effectively denies its LGBTQ members access to the fertility treatment coverage provided by their plans altogether, as compared to heterosexual couples who can easily access their promised benefits under these plans.

5. Plaintiff Mara Berton and her wife June Higginbotham's experience exemplifies Aetna's intentional discrimination against its LGBTQ members. They are members of an Aetna plan that provides fertility coverage. They want to have children but cannot become pregnant through intercourse. Yet, when Mara and June's doctor sought approval for the IUI that Mara

---

[2] Plaintiff recognizes that not all individuals with uteruses who wish to become pregnant identify as "women" in the common use of that term to refer to gender identity, and therefore does not use the term "women" in defining the class of affected persons. Likewise, Plaintiff recognizes that not all individuals who produce sperm identify as "men." The discrimination at issue applies to LGBTQ individuals with uteruses who seek fertility treatments to carry a pregnancy themselves and who cannot become pregnant through sexual intercourse with their partner because of their own sexual orientation or gender identity or that of their partner. Plaintiff explains further herein exactly who falls within the class of affected individuals and will, as appropriate throughout, refer to these individuals as "Class Members." Plaintiff will at times refer to Class Members as "women" and to their relationships as "same-sex relationships," but Plaintiff recognizes that Class Members and their partners hold a range of gender identities and that their relationships may not accurately be described as "same-sex." Plaintiff herself identifies as a woman and is in a same-sex relationship.

and June require to become pregnant, Aetna enforced its discriminatory Infertility Policy and denied that coverage *because* Mara and June are in a same-sex relationship. Unlike individuals in heterosexual couples who are in the same position, Mara has been forced to pay thousands of dollars in out-of-pocket costs for IUI, and she would have to continue these expensive treatments—possibly for years—before Aetna would provide any authorization for the fertility treatments included in her plan.

6.      Aetna, through its Infertility Policy, intentionally discriminates against Mara and Class Members based on sexual orientation and gender identity, in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), which prohibits discrimination on the basis of sex in health programs and applies to all Aetna health plans. Notwithstanding the fact that federal civil rights laws prohibiting sex discrimination bar discrimination on the basis of both sexual orientation and gender identity, Aetna insists on maintaining a discriminatory nationwide Infertility Policy.

7.      As a result of Aetna's intentional discrimination, Class Members suffer the indignity of being told they are denied authorization for treatments covered by their plans *because of sexual orientation or gender identity*. They are forced to incur financial costs and  to wait longer than heterosexual couples before qualifying for coverage of the fertility treatments included in their health care plans. Some Class Members suffer physical harm from being required to meet the six-or-12-cycle requirement—a number of cycles that is often contrary to medical advice. It also bears emphasis that Aetna, a company in the health care industry that purports to care for the best interests of the members it serves, subjects Class Members to unlawful discrimination when they are seeking *fertility treatment*, which for many can already be one of the most stressful and anxiety-inducing ordeals of a lifetime. And the significant delays imposed by Aetna on Class Members prior to covering costs can have incredibly high stakes: delay in this context can cause nothing less than loss of a chance to have a genetically related child. These costs, delays, and harms imposed by this Infertility Policy can entirely prevent some

people from becoming pregnant and starting a family at all, denying LGBTQ individuals their equal rights to have children.

8.      Aetna's discrimination is intentional. Aetna intends its Infertility Policy to result in the different treatment of individuals who wish to become pregnant but cannot because of sexual orientation or gender identity, and it knows that the Policy is discriminatory and harmful to those members and their families. Aetna has received countless complaints and criticisms of its Infertility Policy, and when accused of discrimination, it has continued to treat Class Members unequally. Most recently, in 2023, Aetna altered the language of its blatantly discriminatory Infertility Policy to remove the express reference to the sex of a member's partner, but nevertheless has chosen to perpetuate the same discriminatory treatment of LGBTQ Class Members under the Policy's revised wording. There is no question that Aetna knows it is making a process that is already emotionally and physically taxing even more stressful for thousands of LGBTQ Class Members.

9.      Plaintiff therefore brings this case, on behalf of herself and all other Class Members, to end Aetna's willful disregard of federal law by prohibiting Aetna from implementing and enforcing this discriminatory policy nationwide. This lawsuit seeks to hold this company accountable, to stop the unlawful discrimination, and to give Class Members some approximation of a remedy for the irreparable harm that Aetna has caused.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under 42 U.S.C. § 18116(a).

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the acts complained of occurred in the Northern District of California.

12.     Divisional Assignment to the San Jose Division is proper because a substantial part of the acts complained of occurred in Santa Clara County, where Plaintiff resides.

## THE PARTIES

13.     Plaintiff **MARA BERTON** is a 32-year-old woman and a resident of Santa Clara

County in the State of California. At all relevant times, Mara has been enrolled in an employer health plan designed, sold, and administered by Aetna.

14.    Defendant **AETNA INC.** is a company incorporated under the laws of the State of Pennsylvania and whose principal place of business is in Hartford, Connecticut. Aetna designs, markets, sells, supplies, issues, underwrites, and administers health coverage products, including fully-insured and self-funded health benefit plans, for employers, universities, and individuals nationwide. Aetna operates its business throughout the United States, including in California.

15.    Defendant **AETNA LIFE INSURANCE COMPANY** is a company incorporated under the laws of the State of Connecticut and whose principal place of business is in Hartford, Connecticut. On information and belief, Defendant Aetna Life Insurance Company is a wholly-owned Aetna Inc. subsidiary that designs, markets, sells, supplies, issues, underwrites, and administers health coverage products, including fully-insured and self-funded health benefit plans.

16.    Aetna receives federal financial assistance, including through credits, subsidies, and/or contracts of insurance. For example, Aetna provides coverage of medical services in exchange for payments received through Medicaid and Medicare.

17.    At all relevant times, Aetna has designed, marketed, sold, supplied, issued, underwritten, and administered self-funded health plans and fully-insured health plans to numerous employers, universities, and individuals throughout the State of California and nationwide.

## **FACTUAL ALLEGATIONS**

### I.    **Aetna's Infertility Policy Discriminates Against LGBTQ Members Seeking to Become Pregnant.**

18.    Aetna designs, markets, sells, supplies, issues, underwrites, and administers a variety of health plans, including fully-insured and self-funded health benefit plans. Across the nation, individuals enroll in Aetna's plans either through employer- or university-sponsored

group health plans, or through insurance plans purchased individually. Whether fully-insured or self-funded in whole or in part, and whether group-sponsored or purchased individually, Aetna refers to all individuals enrolled in its plans as "Members."

19.    Nationwide, many of these Aetna health plans provide Members with access to fertility benefits. The covered benefits allow Members to pay for the medical care they need to attempt to become pregnant. Medical treatment that assists Members with the process of getting pregnant, known commonly as "fertility treatment," can include assistance with medications stimulating ovulation, diagnostic and other tests, artificial insemination, often in the form of intrauterine insemination ("IUI"),[3] and assisted reproduction, often in the form of in-vitro fertilization ("IVF").[4]

20.    Infertility affects Members from all walks of life, including Members of any sexual orientation. Members who seek to get pregnant can fail to become pregnant without medical intervention for a host of reasons. For many Members with uteruses, the reasons behind their challenges with becoming pregnant will never be explained.[5] For others, infertility can be caused by the inability to get pregnant with their chosen partner, such as a partner with low sperm count or motility or who does not produce sperm at all. Members of all sexual orientations and gender identities may need medical assistance to become pregnant.

21.    Aetna routinely covers such medical assistance for Members in heterosexual

---

[3] Intrauterine insemination ("IUI") "is a procedure that places sperm past the cervix and in a woman's uterus around the time of ovulation." *Intrauterine Insemination (IUI)*, AM. SOC'Y FOR REPROD. MED., https://www.reproductivefacts.org/news-and-publications/patient-fact-sheets-and-booklets/documents/fact-sheets-and-info-booklets/intrauterine-insemination-iui/ (last revised 2016).

[4] In-vitro fertilization (IVF) "is a complex process that involves retrieving eggs from ovaries and manually combining them with sperm in a lab for fertilization" before placing the fertilized eggs in the uterus. *IVF (In Vitro Fertilization)*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/treatments/22457-ivf (last visited Apr. 16, 2023).

[5] *Unexplained Infertility*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/treatments/22456-iui-intrauterine-insemination (last visited Apr. 14, 2023).

relationships but denies coverage to LGBTQ Members. Notwithstanding a need for medical care that is common to Members regardless of the person they choose as their partner in parenthood, Aetna has chosen to intentionally and unlawfully draw lines between its Members in the provision of access to these benefits on the basis of sexual orientation and gender identity. The mechanism for this discrimination is a definition of "infertility" in Aetna's policy documents called "Clinical Policy Bulletins" ("CPB").[6]

22.    As a default, Aetna incorporates, by reference and other agreement, these CPBs into all of the health benefit plans that it designs, administers, markets, and sells. In general, Aetna requires those buying its services to agree to the terms set forth in these CPBs, and Aetna uses the CPBs to administer the services it provides in these plans for all Members in both fully-insured and self-funded plans.

23.    Aetna claims full responsibility for the content of the CPBs. Its website states: "The responsibility for the content of Aetna Clinical Policy Bulletins (CPBs) is with Aetna."

24.    The CPBs, in Aetna's terms, "express Aetna's determination of whether certain services or supplies are medically necessary, experimental and investigational, or cosmetic." Aetna then uses the policies set forth in these CPBs to make the coverage authorizations and determinations that Aetna has contractually agreed to make for its plans.

25.    Aetna has a CPB specifically pertaining to Members' fertility treatment benefits: Clinical Policy Bulletin No. 0327—Infertility (the "Infertility Policy").[7]

26.    Although not all health benefits plans designed, marketed, sold, and administered by Aetna offer fertility benefits, those plans that do offer fertility benefits are by default designed

---

[6] Plaintiff notes from the outset that Aetna's discriminatory Infertility Policy also imposes burdens on those who seek to have a child without a partner, including individuals of every sexual orientation. The additional burdens Aetna imposes on "single" individuals as compared to those Aetna deems to have a partner are beyond the scope of this litigation. As between *partnered* Members, Aetna intentionally discriminates on the basis of sexual orientation and gender identity, and that it cannot do under the law.

[7] For purposes of this complaint, the terms "fertility" services or treatment and "infertility" services or treatment will be used interchangeably.

by Aetna to incorporate and be subject to Aetna's Infertility Policy.

27.    At all times relevant to this lawsuit, the Infertility Policy has contained a definition of "infertile" that Aetna uses as a threshold barrier to refuse authorization for certain individuals from any coverage for fertility treatments otherwise covered by their plans.

28.    Until January 2023, Aetna's Infertility Policy stated, in relevant part:

> For purposes of this policy, a member is considered infertile if he or she is unable to conceive or produce conception after **1 year of frequent, unprotected heterosexual sexual intercourse,** or **6 months of frequent, unprotected heterosexual sexual intercourse** if the female partner is 35 years of age or older. **Alternately, a woman without a male partner** may be considered infertile if she is unable to conceive or produce conception after **at least 12 cycles of donor insemination** (6 cycles for women 35 years of age or older).

29.    This meant that, for all Aetna plans that provided any fertility benefits coverage, until January 2023 there were only two ways to meet Aetna's definition of "infertile" for those under age 35: engaging in (1) "1 year of frequent, unprotected heterosexual sexual intercourse" or (2) 12 cycles of "donor insemination" (e.g., IUI). For those individuals age 35 and over, the same conditions applied, but the number of months or cycles required was reduced to six.

30.    In January 2023, Aetna altered the language but not the substance of its definition of "infertile" in the Infertility Policy. The Infertility Policy as of January 2023 states, in relevant part:

> For purposes of this policy, a person is considered infertile if unable to conceive or produce conception after **1 year of egg-sperm contact** when the female attempting conception is under 35 years of age, **or after 6 months [of] egg-sperm contact** when the female attempting conception is 35 years of age or older. **Egg-sperm contact can be achieved by frequent sexual intercourse or through monthly cycles of timed sperm insemination (intrauterine, intracervical, or intravaginal).** This definition applies to all individuals regardless of sexual orientation or the presence/availability of a reproductive partner.[8]

31.    Thus, since January 2023 and continuing to the present, Aetna plans that provide any fertility benefits provide only two ways to meet Aetna's definition of "infertile" and achieve

---

[8] *Infertility,* AETNA, https://www.aetna.com/cpb/medical/data/300_399/0327.html (last visited Apr. 14, 2023).

authorization for coverage, by Aetna's design. For those under age 35: showing "egg-sperm contact" by engaging in (1) one year of "frequent sexual intercourse" (i.e., frequent heterosexual intercourse) or (2) one year of "monthly cycles of timed sperm insemination (intrauterine, intracervical, or intravaginal)." Likewise for those individuals over 35 years of age, the same conditions apply, but the number of months or cycles required is reduced to six.

32.     Notwithstanding the removal of the word "heterosexual" before "sexual intercourse" and the reference to a "woman without a male partner," the post-January 2023 version of the Infertility Policy is substantively the same as the pre-January 2023 version and continues to discriminate against LGBTQ Class Members by imposing on them different and egregiously more onerous barriers to fertility treatment access than it applies to individuals in heterosexual couples. The purported disclaimer—"This definition applies to all individuals regardless of sexual orientation or the presence/availability of a reproductive partner"—does not eliminate the discrimination against individuals who cannot become pregnant through sexual intercourse with their partner because of sexual orientation or gender identity that is a fundamental aspect of Aetna's Infertility Policy.

33.     Aetna imposes no out-of-pocket cost for individuals in heterosexual partnerships to meet Aetna's definition of infertility. Under the Infertility Policy—at all times, applying either version of the language—an individual in a heterosexual partnership may demonstrate infertility by simply representing to Aetna that they have had 12 or six months, depending on their age, of frequent unprotected heterosexual intercourse. "Frequent" is not defined in the policy and does not require ovulation tracking or timed intercourse.

34.     Aetna permits such individuals in heterosexual partnerships to qualify as "infertile" under this definition of infertility after 12 or six calendar months.

35.     Aetna does not require such individuals in heterosexual partnerships to provide any form of documentation of the sexual intercourse that satisfies this policy, nor does it impose any further requirements with respect to the timing, frequency, or effectiveness of intercourse. Aetna takes individuals in heterosexual partnerships at their word (notwithstanding the myriad

life circumstances that would undermine heterosexual couples' ability to have "frequent" sexual intercourse or other circumstances that would prevent actual "egg-sperm contact" during heterosexual intercourse). Aetna does not require these individuals to prove that their intercourse occurred monthly, timed with the woman's ovulation, or under circumstances that could result in pregnancy.

36.     The fact that Aetna's revised policy offers the option of frequent heterosexual intercourse "to all individuals regardless of sexual orientation" can only be understood as at best illusory, and at worst, insulting. For LGBTQ Class Members—but not individuals in heterosexual partnerships—Aetna *knows* this would require sexual intercourse with someone other than their chosen partner. Purporting to allow LGBTQ individuals who wish to become pregnant to qualify for fertility treatment coverage by engaging in frequent heterosexual intercourse outside of their relationship does not disclaim discrimination, it reinforces Aetna's lack of equal respect for LGBTQ individuals and partnerships.

37.     In practice, LGBTQ individuals who wish to become pregnant and who cannot become so through sexual intercourse with their partner have entirely different requirements before they qualify as "infertile" under Aetna's definition, under both functionally identical versions of the Infertility Policy.

38.     The threshold requirements imposed by both versions of this Infertility Policy on Aetna members in same-sex couples are far more onerous, time-consuming, and expensive than the threshold statement to a doctor of having had "frequent" heterosexual sex over either 12 or six months.

39.     Until January 2023, the only way for such individuals to meet Aetna's definition of "infertile" was by undergoing—and paying out of pocket for—six or 12 cycles of donor insemination, which takes longer than six or 12 months. After January 2023, Aetna will permit proof of "monthly cycles of timed sperm insemination (intrauterine, intracervical, or intravaginal)." The policy does not define what will qualify as "monthly cycles of timed sperm

insemination (intrauterine, intracervical, or intravaginal)."

40.    Aetna does not permit LGBTQ Class Members, unlike individuals in heterosexual relationships, to meet Aetna's definition of "infertile" without documentation of the required insemination treatment.

41.    Aetna does not permit LGBTQ Class Members, unlike individuals in heterosexual relationships, to meet Aetna's definition of "infertile" without expending money. The most common method of donor insemination is IUI.[9] In IUI, a concentrated sperm sample is prepared and inserted directly into the uterus. IUI must be performed by a medical professional. IUI cycles also require ovulation monitoring, either at home or by transvaginal ultrasound, and can involve taking medications to induce ovulation. Each IUI cycle costs at least hundreds of dollars. Those individuals advised by their doctors to take medications spend much more.

42.    Although each IUI attempt is timed to an ovulation cycle, six or 12 cycles of IUI takes longer than six or 12 months, for a variety of reasons. First, before even beginning IUI cycles, a doctor may recommend that a patient undergo diagnostic procedures and multiple months of pre-natal medication.[10] After an IUI is performed, testing for pregnancy does not immediately follow. A patient must wait, often weeks, after the procedure to determine whether implantation was a success. Determining whether implantation was successful can require further time and testing. Generally, no patient can proceed to another cycle of IUI in the interim. Doctors may also instruct patients to change medications, undergo diagnostic procedures, or wait a certain amount of time before beginning the next cycle. Some patients may experience chemical or ectopic pregnancies or early miscarriages, all of which can extend the time between IUI attempts. Patients frequently take breaks between cycles to recover physically and emotionally from unsuccessful attempts. Others have other life or work events that prevent them

---

[9] *Intrauterine Insemination (IUI)*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/intrauterine-insemination/about/pac-20384722 (last visited Apr. 14, 2023).

[10] *IUI (Intrauterine Insemination)*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/treatments/22456-iui-intrauterine-insemination (last visited Apr. 14, 2023).

from being able to dedicate time, month after month, to multiple ovulation monitoring and insemination appointments. Many individuals simply do not have the economic means (particularly many people of color and people with less economic means) to afford the amount of time off work that Aetna's standard requires for LGBTQ Class Members.

43.     Aetna's Infertility Policy will also be directly contrary to medical advice for many LGBTQ individuals. For example, one medication used to induce ovulation, commonly prescribed with an IUI cycle to increase chances of success, "is not recommended beyond a total of about six cycles" by the FDA.[11]

44.     The Infertility Policy requirement that LGBTQ Class Members go through six or 12 cycles of insemination just to meet the definition of "infertile" is also more than many doctors would recommend at all before moving on to methods like in-vitro fertilization ("IVF").[12]

45.     The current Infertility Policy specifies that certain individuals seeking coverage of fertility treatment can also be deemed "infertile" after six or 12 cycles of intracervical (ICI) or intravaginal (IVI) insemination. These options, whether performed with or without medical supervision, involve significant expense, may not be viable, available, or medically advisable, and could have adverse legal consequences to parental rights.

46.     Thus, Aetna, through its Infertility Policy, intentionally imposes significant out-of-pocket costs on Class Members and requires longer threshold periods of time before qualification than it imposes on others before it will deem Class Members eligible for coverage of fertility treatment under all of its plans that include those benefits.

47.     The harms caused by Aetna's discriminatory actions go beyond simply the costs imposed and time that Class Members must wait. For individuals who do not have the funds to pay the extra up-front costs Aetna is imposing on LBGTQ couples for medical care, the

---

[11] *Approval Package for Application Number: NDA 016131/S-026* (Clomid), CTR. FOR DRUG EVAL. & RESEARCH, FOOD & DRUG ADMIN., at 11, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/016131Orig1s026.pdf.

[12] *IUI (Intrauterine Insemination)*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/treatments/22456-iui-intrauterine-insemination (last visited Apr. 14, 2023).

difference may very well be between having a genetically related child and losing the chance to do so. The particular nature of this discrimination—forcing LBGTQ families to pay more and wait longer before they receive the fertility treatment they need—will have disproportionate effects on those with less money and who are running out of time for a variety of biological reasons, including age. Aetna's discriminatory policy blocks access to those benefits entirely for those without sufficient resources to pay out of pocket for fertility treatment.

48.     There are many individuals, even those with relatively good health benefit coverage that includes fertility treatment benefits, who have been or will be unable to pay out of pocket for the six or 12 rounds of medical treatment that Aetna requires *before* permitting these individuals access to their benefits going forward. For individuals in low-paying jobs, thousands of dollars in additional out-of-pocket expenses for medical care may prevent them from obtaining that care altogether.

49.     The impact of the greater delays imposed on LGBTQ Class Members as compared to heterosexual couples who wish to become pregnant is likewise profound. Time is crucial in the context of fertility treatment, and the amount of additional time imposed by Aetna's definition of infertility could very well be the difference between successful and unsuccessful treatment, or the difference between success using IUI and the need to move on to more costly and invasive procedures. In addition to the difficulties caused by the passage of time, many individuals who wish to become pregnant have access only to limited amounts of sperm (for reasons as varied as economics, limited sources of genetically-related material, or limited access to donated gametes that share racial or ethnic characteristics, which is a particular difficulty for LGBTQ persons of color).

50.     In addition, because of the nature of fertility treatment, doctors will often advise moving on to more invasive and expensive procedures (like IVF) before an individual has met Aetna's threshold, thus effectively excluding those individuals from coverage at all (or cruelly forcing individuals to decide whether to adhere to their doctor's medical assessment or comply with Aetna's policy *against medical advice.*). In these circumstances, Class Members whose

plans include coverage for IUI but not IVF will be foreclosed from ever receiving any coverage for fertility treatments. For those Class Members whose plans include coverage for IVF, this policy also functionally precludes the determination of infertility that would be needed for IVF coverage.

51.     As discussed above, not all of the plans Aetna designs, sells, and administers offer fertility benefits, but many of those plans do. In California, most plans sold to and administered for customers in the state contain fertility benefits. Since 1990, California law has required insurance companies to offer coverage for fertility treatments, except for in-vitro fertilization, in their fully-insured plan offerings. Cal. Ins. Code § 10119.6(a); Cal. Health & Safety Code § 1374.55. Therefore, all fully-insured plans issued by Aetna in California offer some fertility treatment coverage. On information and belief, Aetna also has designed, marketed, sold, and administered a standard self-funded plan that allows plan sponsors to elect fertility benefits. On information and belief, many plan sponsors in California elect to include these benefits given the local market expectations created by the state law. Individuals who are Members of Aetna plans that do not include fertility benefits—because of plan sponsor choice or for any other reason— are not subject to Aetna's discriminatory Infertility Policy, and as explained further below, are not included in the Classes in this case.

## II.     Aetna Has Discriminated Against and Continues to Discriminate Against Plaintiff Mara Berton.

52.     Since September 10, 2021, Mara Berton has been enrolled in an Aetna health plan sponsored by her wife June Higginbotham's employer, Encore Group USA LLC ("Encore Group Policy"). Mara and June will remain enrolled in the Aetna-administered Encore Group Policy for the foreseeable future. This plan is an employer-funded plan marketed, sold, and administered by Aetna Inc. and its subsidiary Aetna Life Insurance Company.

53.     June is enrolled in the Encore Group Policy as an employee, and Mara is enrolled as June's spouse.

54.     Under the Encore Group Policy, Aetna administers coverage for the diagnosis and

treatment of infertility.

55. Under the Encore Group Policy, Aetna administers coverage for "[c]omprehensive infertility services," including "artificial insemination cycle[s] with or without injectable medication to stimulate the ovaries."

56. Mara and June want a family with at least two children. Because they are LGBTQ individuals in a same-sex couple and cannot become pregnant through sexual intercourse, Mara is attempting to get pregnant through fertility treatments.

57. In January of 2022, Mara and June decided to start their family, and they began pursuing fertility treatments for Mara to become pregnant. Mara's physician advised IUI treatment.

58. In February 2022, in advance of attempting any IUI cycles, Mara's fertility clinic submitted a claim to Aetna for preauthorization for up to six cycles of IUI.

59. Shortly thereafter, an Aetna representative called Mara and informed her that the request was denied by Aetna.

60. On February 21, 2022, Aetna formally denied Mara's clinic's request on her behalf for coverage of IUI by letter.

61. Mara appealed Aetna's denial of coverage on June 11, 2022. Mara stated in her appeal, "I am unable to engage in 'frequent, unprotected heterosexual sexual intercourse' because I am a woman married to a woman," and explained that Aetna's discriminatory denial of coverage violated federal law and was unethical. Mara further stated, "In addition to the exorbitant discriminatory financial burden that Aetna has placed on my family, this denial of coverage also adds an emotional strain on a process that is already emotionally taxing. To be denied coverage because I am gay is a blatant reminder that LGBTQ people are still treated as second class citizens in many ways."

62. On June 30, 2022, Aetna denied Mara's appeal, explaining that coverage for IUIs was not "medically necessary" under the terms of Mara's plan because she did not meet the Infertility Policy's definition of "infertile." Mirroring the language of the Infertility Policy, Aetna

wrote:

> We consider an individual infertile if the individual is unable to conceive or produce conception after one (1) year of frequent, unprotected heterosexual sexual intercourse, or six (6) months of frequent, unprotected heterosexual sexual intercourse if the female partner is 35 years of age or older. Alternately, a woman without a male partner may be considered infertile if she is unable to conceive or produce conception after at least twelve (12) cycles of donor insemination (six (6) cycles for women 35 years of age or older). Meeting the definition of infertility is a requirement of the member's insurance plan. Our records don't show the member meet [sic] these criteria.

63.     On August 7, 2022, Mara filed a second-level appeal of Aetna's denial of coverage. Aetna again denied Mara's second-level appeal.

64.     As a result of Aetna's discriminatory denial of coverage, Mara and June had to pay up front and out of pocket for Mara's fertility treatments, including IUI and related monitoring appointments. To date, Mara has undergone four cycles of IUI unsuccessfully—which took far longer than four months. To meet Aetna's discriminatory requirement that she undergo 12 IUI cycles before even being eligible for the coverage she is otherwise entitled to under her policy (including IUI), Mara would be required to undergo eight more IUI cycles.

65.     Each cycle of IUI cost Mara hundreds of dollars out of pocket. Mara has also incurred significant additional directly related medical costs not covered by Aetna.  As a result of Aetna's discriminatory Infertility Policy, Mara has paid thousands of dollars out of pocket for fertility treatments that would have been covered by her Aetna health plan if she were in a heterosexual relationship. Aetna's discrimination has made an already expensive process even more unaffordable.

**III. Aetna's Discrimination Violates the Anti-Discrimination Protections of the ACA.**

66.     Aetna has engaged and continues to engage in the discriminatory conduct described above despite Section 1557 of the ACA, which prohibits discrimination on the basis of sex, including discrimination on the basis of sexual orientation and gender identity, in any health program or activity that receives federal financial assistance.

67.     Section 1557 was enacted as part of the Affordable Care Act's sweeping reform to the United States health insurance system. The Department of Health and Human Services

recognizes that "Section 1557 of the ACA (Section 1557) is one of the government's most powerful tools to ensure access to and coverage of health care in a nondiscriminatory manner."[13]

68.     Thus, Section 1557 of the ACA provides: "Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection." 42 U.S.C. § 18116(a).

69.     Aetna is subject to Section 1557 because it receives federal financial assistance. For example, Aetna receives payments from the federal government for administering various Medicare and Medicaid plans.[14]

**IV.     Aetna Has Caused Plaintiff Mara Berton Injury.**

70.     Mara has been injured by Aetna's discriminatory acts requiring her to pay out of pocket for fertility treatments as a prerequisite to receiving coverage because of her sexual orientation.

71.     To date, Mara has incurred thousands of dollars in medical costs for her IUI procedures due to Aetna's discrimination, and she would be forced to incur many thousands of dollars in further costs to satisfy the requirements for coverage under Aetna's discriminatory

---

[13] *Notice of Proposed Rulemaking, Nondiscrimination in Health Programs and Activities*, 87 Fed. Reg. 47,824, 47,825 (Aug. 4, 2022).

[14] *Aetna Medicare Solutions*, AETNA, https://www.aetnamedicare.com (last visited Apr. 14, 2023); *Aetna Medicaid*, AETNA, http://www.aetnamedicaidadministrators.com (last visited Apr. 14, 2023).

1    policy.

2        72.    Further, Mara will be denied coverage again when she attempts to have a second

3    child, and will again be forced to spend thousands of dollars out of pocket to meet Aetna's

4    discriminatory eligibility requirements, unless Aetna is enjoined from continuing to discriminate

5    on the basis of sexual orientation and gender identity with regard to fertility coverage. Aetna's

6    discrimination is thus causing Mara ongoing harm.

7        73.    Mara has also endured great mental strain from the knowledge that she is being

8    subjected to unequal treatment because of her sexual orientation and forced to incur substantial

9    costs for a process that is covered for people in opposite-sex relationships. That stress

10   exacerbates the physical and emotional toll of IUI itself, which is substantial. Had Aetna covered

11   fertility treatments for Mara from the start, she would have been able to choose the best course of

12   treatment for herself based on her personal circumstances, in consultation with her doctors,

13   without the added burdens of discrimination.

14       74.    On information and belief, many thousands of other individuals subject to Aetna's

15   discrimination have likewise been required to pay out-of-pocket expenses in order to qualify for

16   fertility treatment coverage that should be covered by their health plans and that is provided to

17   heterosexual couples without such threshold costs.

18       75.    On information and belief, many thousands of other individuals subject to Aetna's

19   discrimination have suffered further and additional harm, including delays in treatment and

20   physical harm, from the demands that Aetna's policy places on LBGTQ individuals who cannot

21   become pregnant with their partner due to sexual orientation or gender identity, which Aetna

22   does not place on individuals in heterosexual relationships who want to become pregnant.

23   **III.    Class Allegations**

24       76.    Plaintiff Mara Berton seeks prospective relief on behalf of a National Injunctive

25   Relief Class under Rule 23(b)(2) and damages on behalf of a California Damages Class under

26   Rule 23(b)(3) of the Federal Rules of Civil Procedure (together, "Class Members").

27       77.    The National Injunctive Relief Class under Rule 23(b)(2) is defined as follows:

28

All LGBTQ individuals with uteruses who are or will be Members of an Aetna health plan in the United States that includes fertility benefits and incorporates the Infertility Policy.

78.     The California Damages Class under Rule 23(b)(3) is defined as follows: All LGBTQ individuals with uteruses who, at any time in the last four years, are or were Members of an Aetna health plan in California that included fertility benefits and incorporated Aetna's Infertility Policy, and who incurred out-of-pocket expenses and/or other compensable damages as a result of Aetna's Infertility Policy.

79.     Aetna's discriminatory Infertility Policy imposes on LGBTQ individuals who wish to become pregnant a burden to undergo and pay out of pocket for six to 12 cycles of donor insemination before they can be deemed eligible for covered fertility treatment. In this way, Aetna forces Class Members to make the painful choice between incurring the time delays and expense of additional medical procedures or forgoing fertility treatment—thus posing an immediate and ongoing threat to the National Injunctive Relief Class's rights under Section 1557 of the ACA to be free from discrimination on the basis of sex.

80.     The Classes are so numerous that joinder of all individual members would be impracticable.

81.     An estimated 39 million people in the United States rely on Aetna health insurance plans and services.[15]

82.     Approximately 7.2% of U.S. adults identify as lesbian, gay, bisexual, transgender, or something other than straight or heterosexual.[16]

83.     According to the California Department of Insurance, Aetna administers health

---

[15] *Aetna Facts*, AETNA, https://www.aetna.com/about-us/aetna-facts-and-subsidiaries/aetna-facts.html (last visited Apr. 14, 2023).

[16] Jeffrey M. Jones, *What Percentage of Americans Are LGBT?*, GALLUP (revised Feb. 26, 2023). https://news.gallup.com/poll/332522/percentage-americans-lgbt.aspx (last visited Apr. 14, 2023).

1  insurance plans for over one million Californians.[17]

2       84.    Approximately 9.1% of Californians, or 2.7 million people, identify as lesbian,

3  bisexual, gay or transgender, making California the state with the largest LGBTQ population in

4  the country.[18]

5       85.    Thus, based upon these estimates, Aetna administers health plans for

6  approximately 2.8 million LGBTQ individuals nationwide and more than 91,000 LGBTQ

7  individuals in California alone. On information and belief, in addition to Plaintiff, that group

8  includes many thousands of people with uteruses and of reproductive age who, due to their

9  sexual orientation or gender identity or that of their partner, have needed or will need fertility

10 treatment to become pregnant. On information and belief, in addition to Mara, this group

11 includes many thousands of individuals who have incurred out-of-pocket expenses for fertility

12 treatments and/or other compensable damages as a result of Aetna's discriminatory Infertility

13 Policy.

14      86.    The questions of law and fact presented by Plaintiff's claim are common to all

15 members of the Classes. Among others, questions common to the Classes include:

16         a.   What requirements Aetna's Infertility Policy imposes on individuals in

17             heterosexual partnerships when they seek coverage for fertility treatments

18             under Aetna health benefits plans;

19         b.   Whether Aetna imposes different and more onerous requirements on Class

20             Members seeking coverage for fertility treatments under Aetna health benefits

21             plans, including requiring these individuals to expend out-of-pocket costs and

22             go through additional medical treatment to meet the threshold determination

23             of "infertile" before allowing coverage for further treatment;

24         c.   Whether Aetna's Infertility Policy discriminates on the basis of sex, including

25

26 [17] *Health Insurance Covered Lives Report*, CAL. DEP'T OF INS., http://www.insurance.ca.gov/01-consumers/110-health/coveredlivesrpt.cfm (last visited Apr. 14, 2023).

27

28 [18] Hans Johnson, *California's LGBT Population*, PUB. POL'Y INST. OF CAL. (June 28, 2022), https://www.ppic.org/blog/californias-lgbt-population/.

on the basis of sexual orientation and/or gender identity;

d.   Whether Aetna incorporates via common contractual provisions its CPBs, including the Aetna Infertility Policy, as the default policies applicable to all of its health plans that offer fertility benefits, in California and nationwide; and

e.   Whether Aetna is subject to the ACA because it receives federal funding.

87.   Common issues of law and fact predominate over any individual issues arising from Class Members' claims against Aetna for unlawful discrimination in violation of Section 1557.

88.   Plaintiff's claims for prospective relief are typical of the National Injunctive Relief Class under Rule 23(b)(2). Individuals enrolled in Aetna plans across the country that offer fertility benefits, like Plaintiff's plan, are subject to Aetna's Infertility Policy. Class Members who are subject to this Infertility Policy may currently or in the future desire to become pregnant while in a same-sex partnership, and may seek authorization for fertility treatments covered under their Aetna plan. Class Members who seek fertility treatment will not be able to meet Aetna's discriminatory definition of "infertile" without expending the time and expense of six or 12 months of timed insemination required by that Policy. For those Class Members who cannot afford to pay for treatment themselves, they will face the choice of forgoing or irreversibly delaying their ability to become pregnant.

89.   Plaintiff and members of the National Injunctive Relief Class are reasonably fearful that Aetna will continue to subject its members to discrimination on the basis of sex by maintaining its discriminatory Infertility Policy and applying it across all health plans.

90.   The entire National Injunctive Relief Class under Rule 23(b)(2) will benefit from the injunctive relief sought herein.

91.   Plaintiff's claims are also typical of the claims of the members of the California Damages Class under Rule 23(b)(3), all of whom, like Plaintiff, are subject to Aetna's

1  discriminatory Infertility Policy and have incurred expenses or other compensable damages for

2  fertility treatments that should have been covered by their Aetna health plan.

3      92.    Plaintiff has no conflicts of interest with any members of the Classes, is

4  committed to vigorous prosecution of all claims on behalf of members of the Classes, and will

5  fairly and adequately protect the interests of the Classes.

6      93.    A class action is superior to any other method for the fair and efficient resolution

7  of this legal dispute, as joinder of all members of the Classes is impracticable. Further, the

8  prosecution of thousands of individual actions by individual members of the Classes would

9  create the substantial risk of inconsistent or varying adjudications, which would establish

10 potentially incompatible standards of conduct for Aetna.

11     94.    The Classes are represented by competent counsel experienced in litigating

12 discrimination cases and class action cases.

13 **FIRST CAUSE OF ACTION**
42 U.S.C. § 18116(a)
14 Discrimination in Health Care on the Basis of Sex
(On Behalf of Plaintiff, the National Injunctive Relief Class, and the California Damages Class)
15

16     95.    Plaintiff and the Classes reallege as if fully set forth herein the allegations

17 contained in the preceding paragraphs.

18     96.    Section 1557 of the ACA prohibits discrimination on the basis of sex, including

19 discrimination on the basis of sexual orientation and gender identity, in any health program or

20 activity that receives federal financial assistance.

21     97.    Aetna receives federal financial assistance and is a health program or activity, and

22 it is therefore covered by Section 1557 of the ACA.

23     98.    Aetna intentionally discriminates on the basis of sex in violation of Section 1557

24 by requiring Class Members—who cannot become pregnant through sexual intercourse with

25 their partner because of their sexual orientation or gender identity or that of their partner—to

26 satisfy different and more onerous requirements than those required of plan members in

27 heterosexual couples, including but not limited to incurring substantial costs, as a prerequisite to

28

receiving coverage for fertility services under all Aetna plans that include fertility benefits and incorporate the discriminatory Infertility Policy.

99.     Aetna has intentionally discriminated against Class Members, currently continues to discriminate against Class Members, and will continue to do so in the future by application and enforcement of its Infertility Policy to the detriment of Class Members.

100.     As a direct result of Aetna's violation of Plaintiff's and Class Members' rights under Section 1557 of the ACA, Plaintiff and the California Damages Class have suffered compensable damages, including damages for physical and financial injury.

101.     All the acts and omissions committed by Aetna described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages. Accordingly, Plaintiff and the California Damages Class under Rule 23(b)(3) are entitled to compensatory and punitive damages, as well as reasonable attorneys' fees, costs, and disbursements.

102.     Plaintiff and the Nationwide Injunctive Class are entitled to injunctive and declaratory relief, as well as reasonable attorneys' fees, costs, and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendants as follows:

A. Declaring that Defendants violated Plaintiff's and the Classes' rights under Section 1557 of the ACA by virtue of its discriminatory Infertility Policy, and that Defendants are likely to continue to cause ongoing violations of Plaintiff's and the Classes' rights;

B. Permanently enjoining nationwide Defendants from implementing and enforcing Aetna's discriminatory Infertility Policy and from designing, marketing, selling, supplying, issuing, underwriting, or administering plans that include, incorporate, or rely on any policy that denies equal fertility treatment coverage to individuals who

1        cannot become pregnant through sexual intercourse with their partner because of

2        sexual orientation or gender identity;

3     C.  Awarding compensatory damages in an amount to be determined at trial;

4     D.  Awarding punitive damages in an amount to be determined at trial;

5     E.  Awarding reasonable attorneys' fees, costs, and disbursements; and

6     F.  Awarding such other and further relief as this Court deems just and equitable.

7                  **<u>DEMAND FOR JURY TRIAL</u>**

8       Plaintiff hereby demands a jury trial on all causes of action and claims with respect to

9 which she has a right to a jury trial.

10                  Respectfully submitted,

11

12  Dated: April 17, 2023       **LIU PETERSON FISHER LLP**

13                By:     <u>/s/ *Rebecca Peterson-Fisher*</u>

14                      Rebecca Peterson-Fisher
                           Jennifer L. Liu

15                      C. Leah Kennedy
                      **LIU PETERSON FISHER LLP**

16                      1204 Burlingame Ave., Suite 3
                      Burlingame, CA 94010

17                      Tel: 650.461.9000
                      Fax: 650.460.6967

18

19  Dated: April 17, 2023       **ALTSHULER BERZON LLP**

20                By:     <u>/s/ *Connie K. Chan*</u>
                      Danielle E. Leonard

21                      Connie K. Chan
                      Robin S. Tholin

22                      **ALTSHULER BERZON LLP**

23                      177 Post Street, Suite 300
                      San Francisco, CA 94108

24                      Tel: 415.421.7151
                      Fax: 415.362.8064

25

26  Dated: April 17, 2023       **NATIONAL WOMEN'S LAW CENTER**

27                By:     <u>/s/ *Michelle Banker*</u>

28

COMPLAINT

Michelle Banker*
Alison Tanner*
Noel León*
Sudria Twyman*
Sunu Chandy*
**NATIONAL WOMEN'S LAW CENTER**
1350 I Street NW, Suite 700
Washington, DC 20005
Tel: 202.588.5180

*Pro hac vice application forthcoming*

*Attorneys for Plaintiff and the Putative Class*

COMPLAINT

## <u>ATTESTATION</u>

Pursuant to Civil Local Rule 5-1(h)(3), I, Connie K. Chan, hereby attest that each signatory has concurred in the filing of this document.

Dated: April 17, 2023          By:     <u>/s/ *Connie K. Chan*          </u>
                                       Connie K. Chan