MEAGHAN VERGOW*
mvergow@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Telephone:   (202) 383-5300
Facsimile:    (202) 383-5414

MOLLY LENS (S.B. #283867)
mlens@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone:   (310) 553-6700
Facsimile:    (310) 246-6779

SUSANNAH K. HOWARD (S.B.#291326)
showard@omm.com
KRISTIN MACDONNELL (S.B. #307124)
kmacdonnell@omm.com
**O'MELVENY & MYERS LLP**
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
Telephone:   (415) 984-8700
Facsimile:    (415) 984-8701

Attorneys for Defendants
Aetna Inc. and Aetna Life Insurance
Company
* *admitted pro hac vice*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| MARA BERTON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AETNA INC. and AETNA LIFE INSURANCE COMPANY,<br><br>Defendants. | Case No. 4:23-cv-01849-HSG<br><br>**DEFENDANTS AETNA INC. AND AETNA LIFE INSURANCE COMPANY'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT**<br><br>**Hearing Date**: October 12, 2023<br>**Time**: 2:00 p.m.<br>**Location**: Ronald V. Dellums Federal Building, 1301 Clay Street, Oakland, CA 94612 Courtroom 2, 4th Floor |

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    PLAINTIFF DOES NOT PLAUSIBLY ALLEGE INTENTIONAL DISCRIMINATION UNDER SECTION 1557. ........................................................ 2

        A.    The Plan and Policy Are Not Facially Discriminatory. .......................................... 3

            (i)    The Plan and Policy Do Not Draw Textual Distinctions Based on a Protected Status. ................................................................................................................. 3

            (ii)    The Plan and Policy Do Not Uniquely Burden LGBTQ Members. .................. 4

            (iii)    Plaintiff's Proxy Discrimination Theory Also Fails. ....................................... 6

        B.    Plaintiff Does Not Plausibly Allege "Unequal" Enforcement. ................................ 9

    II.    PLAINTIFF'S FAILURE TO JOIN A NECESSARY AND INDISPENSABLE PARTY PRECLUDES RELIEF ON HER CLAIMS AND CONFLICTS WITH ERISA. ................................................................................................................... 10

        A.    Encore Is a Necessary Party. .................................................................................. 10

        B.    Encore Cannot Feasibly Be Joined. ....................................................................... 13

        C.    Encore Is Indispensable, and the Action Must Be Dismissed. ............................... 13

    III.    AETNA INC. SHOULD BE DISMISSED. ................................................................. 14

CONCLUSION ............................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Health Inc. v. Davila*,
 542 U.S. 200 (2004) ............................................................................................................. 10

*Bach v. Forever Living Prods. U.S.*, Inc.,
 473 F. Supp. 2d 1127 (W.D. Wash. 2007) ........................................................................... 15

*Baird v. Blackrock Institutional Tr. Co., N.A.*,
 2020 WL 7389772 (N.D. Cal. Feb. 11, 2020) ...................................................................... 14

*Bonnette v. Dick*,
 2020 WL 3412733 (E.D. Cal. June 22, 2020) ...................................................................... 15

*Briscoe v. Health Care Serv. Corp.*,
 281 F. Supp. 3d 725 (N.D. Ill. 2017) ................................................................................. 5, 7

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*,
 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) ............................................................... 13

*Colum. Exp. Terminal, LLC v. Int'l Longshore & Warehouse Union*,
 23 F.4th 836 (9th Cir. 2022) ................................................................................................. 10

*Curtiss-Wright Corp. v. Schoonejongen*,
 514 U.S. 73 (1995) ............................................................................................................... 11

*E.E.O.C. v. Peabody W. Coal Co.*,
 400 F.3d 774 (9th Cir. 2005) ................................................................................................ 13

*Egelhoff v. Egelhoff ex rel. Breiner*,
 532 U.S. 141 (2001) ............................................................................................................. 11

*Frank v. United Airlines*,
 216 F.3d 845 (9th Cir. 2000) .................................................................................................. 5

*Frappied v. Affinity Gaming Black Hawk, LLC*,
 966 F.3d 1038 (10th Cir. 2020) .............................................................................................. 8

*Geduldig v. Aiello*,
 417 U.S. 484 (1974) ............................................................................................................... 6

*Gerdom v. Cont'l Airlines, Inc.*,
 692 F.2d 602 (9th Cir. 1982) .............................................................................................. 3, 5

*Hecox v. Little*,
 2023 WL 5283127 (9th Cir. Aug. 17, 2023) .......................................................................... 7

*Kescoli v. Babbitt*,
 101 F.3d 1304 (9th Cir. 1996) .............................................................................................. 14

*McShan v. Sherrill*,
 283 F.2d 462 (9th Cir. 1960) ................................................................................................ 11

*Nguyen v. INS*,
 533 U.S. 53 (2001) ................................................................................................................. 6

*Pac. Shores Props., LLC v. City of Newport Beach*,
 730 F.3d 1142 (9th Cir. 2013) ........................................................................................... 7, 8

## TABLE OF AUTHORITIES
(Continued)

Page(s)

*Philippines v. Pimentel*,
 553 U.S. 851 (2008) ............................................................................................................... 14

*Phillips v. Martin Marietta Corp.*,
 400 U.S. 542 (1971) ................................................................................................................. 8

*Polonczyk v. Anthem BlueCross & BlueShield*,
 586 F. Supp. 3d 648 (E.D. Ky. 2022) ...................................................................................... 5

*Potter v. Chevron Prods. Co.*,
 2018 WL 4053448 (N.D. Cal. Aug. 24, 2018) ...................................................................... 11

*Religious Sisters of Mercy v. Becerra*,
 55 F.4th 583 (8th Cir. 2022) .................................................................................................. 11

*Rice v. Cayetano*,
 528 U.S. 495 (2000) ................................................................................................................. 7

*Salt River Project Agric. Improvement & Power Dist. v. Lee*,
 672 F.3d 1176 (9th Cir. 2012) ............................................................................................... 10

*Sprewell v. Golden State Warriors*,
 266 F.3d 979 (9th Cir. 2001) ............................................................................................ 4, 12

*Surman v. UPMC Presbyterian Shadyside*,
 2018 WL 4901107 (W.D. Pa. Oct. 9, 2018) .......................................................................... 15

*Sypher v. Aetna Insurance Co.*,
 2014 WL 1230028 (E.D. Mich. Mar. 25, 2014) .................................................................... 14

*Tovar v. Essentia Health*,
 857 F.3d 771 (8th Cir. 2017) ................................................................................................. 13

*UAW v. Johnson Controls, Inc.*,
 499 U.S. 187 (1991) ................................................................................................................. 8

*Weinreb v. Xerox Business Services, LLC Health and Welfare Plan*,
 323 F. Supp. 3d 501 (S.D.N.Y. 2018) ................................................................................. 5, 7

**Statutes**

29 U.S.C. § 1104(a)(1)(D) ............................................................................................................ 11, 12

**Other Authorities**

*Acknowledgment of Terms and Conditions*, Medical Clinical Policy Bulletins,
 Aetna, https://www.aetna.com/health-care-professionals/clinical-policy-
 bulletins/medical-clinical-policy-bulletins.html ...................................................................... 12

*Infertility Services Precertification Information Request Form*, Aetna,
 https://www.aetna.com/content/dam/aetna/pdfs/aetnacom/pharmacy-
 insurance/healthcare-professional/documents/infertility-services-
 precertification-request-form.pdf .............................................................................................. 9

**Rules**

Fed. R. Civ. P. 19 ............................................................................................................................. 10

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

Fed. R. Civ. P. 19(a)(1)(A) ........................................................................................................... 11

Fed. R. Civ. P. 19(b) ..................................................................................................................... 13

Fed. R. Civ. P. 7(b) ....................................................................................................................... 15

iv

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS COMPLAINT
CASE NO. 4:23-CV-01849-HSG

**INTRODUCTION**

Plaintiff's Complaint ultimately takes issue with her plan sponsor's decision to include one benefit in its employee health Plan (treatment for medical infertility) and not another (conception assistance needed for non-medical reasons). But ERISA protects that choice and Section 1557 does not prohibit it. Plaintiff's flawed pleading should be dismissed.[1]

Plaintiff fails to establish a claim for intentional discrimination under Section 1557. Plaintiff first argues that the policy implementing the challenged infertility benefit is "facially discriminatory," but she must mischaracterize the policy—which is properly before the Court on this Motion—to do so. Case in point, Plaintiff reads express distinctions into the policy that simply do not exist—terms like "cisgender members" and "heterosexual relationships."

Plaintiff also argues that the policy imposes burdens on same-sex couples that others avoid. But the policy requires *all* members to demonstrate medical infertility by meeting standard medical criteria to determine whether infertility services are medically necessary, as defined by the Plan. At bottom, Plaintiff seeks an *exemption* for certain members from the generally applicable requirement that medical infertility must be established before obtaining infertility benefits. But requiring medical necessity to obtain health insurance benefits is not "facial discrimination."

Plaintiff next contends that it is "proxy" discrimination to permit members to demonstrate infertility by showing that attempts at conception through heterosexual sex have been unsuccessful over a certain period of time, as this option is not available to her. But Plaintiff does not allege facts, as she must, indicating that this option was adopted to target or otherwise intentionally disadvantage LGBTQ members. The policy simply reflects the biological reality that human conception can occur only through egg-sperm contact, and that egg-sperm contact may be accomplished through heterosexual sex or through medically assisted methods. To claim benefits for medical infertility, *all* members must show that repeated egg-sperm contact (however

---

[1] Unless otherwise defined, all acronyms and defined terms used herein are identical to those used in Defendants' Motion to Dismiss ("Mot."), ECF 40. "Opp." refers to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 45. In this briefing, both parties refer to persons assigned female at birth as "women." *See* Opp. 4 n.3.

accomplished) has not resulted in conception over a specific number of cycles.  The fact that one way of making that showing may generally be unavailable to Plaintiff is not the result of the policy.

In the alternative, Plaintiff recasts her claim as one alleging unequal *application* insofar as members in heterosexual relationships are supposedly "taken at their word" when claiming infertility whereas LGBTQ members are not.  But the policy does not say that, and in reality all members must submit the same physician-attested form to claim this benefit.  Plaintiff does not and could not allege otherwise.

Independently, Plaintiff's complaint should be dismissed because Encore, the Plan sponsor—who selects and defines the Plan's benefits, including infertility benefits—is not before the Court.  As a claims administrator, Aetna is bound by ERISA to follow the Plan terms, yet Plaintiff's Opposition concedes that her Plan does not cover the benefits she is seeking (*contra* Compl. ¶¶ 85, 91).  Her claims necessarily propose to *change* the terms of her Plan, and Encore would have to be joined to this action to do so.  Plaintiff cannot obtain relief on her complaint about the benefits choice made by her Plan's sponsor without involving that sponsor.  And without a change to the plan, her claims would subject Aetna to conflicting duties.

Last, Aetna Inc. should be dismissed because Plaintiff alleges no facts showing it administered or was otherwise involved with the Plan.  Plaintiff responds only that the Court should ignore the materials showing that Aetna Inc. is not an administrator, but she has no answer for the deficiency of her allegations.  On the face of the complaint, Aetna Inc. is not a proper defendant.

## ARGUMENT

### I. PLAINTIFF DOES NOT PLAUSIBLY ALLEGE INTENTIONAL DISCRIMINATION UNDER SECTION 1557.

Plaintiff agrees that she must adequately plead intentional discrimination under Section 1557 and offers two theories of disparate treatment: (1) the infertility policy is "facially discriminatory"; and (2) even if the policy is facially neutral, Aetna's purported "unequal" enforcement demonstrates animus. Opp. 8-9.  Both theories fail.  The policy is neutral on its face; Plaintiff's arguments that it impermissibly burdens LGBTQ individuals or engages in "proxy" discrimination cannot convert her (legally insufficient) complaint of disparate impact into one of

(actionable) "facial discrimination." And Plaintiff's selective enforcement theory is both unsupported by plausible allegations and controverted by the policy itself. In reality, the Plan and implementing policy extend medical infertility benefits to all members on equal terms.

### A. The Plan and Policy Are Not Facially Discriminatory.

Plaintiff argues that the policy is "facially discriminatory," which requires her to show that the policy, "on its face," "applies less favorably to" a protected class. *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 608 (9th Cir. 1982) (en banc). As explained below, each of the three theories she offers in support lacks merit.

#### (i) The Plan and Policy Do Not Draw Textual Distinctions Based on a Protected Status.

Plaintiff's argument that the Plan and policy make textual distinctions between groups is foreclosed by the documents themselves. The Plan provides the same infertility benefits to all members, regardless of sexual orientation. The only distinction the Plan draws—for infertility benefits, as for other benefits—is whether the treatments are medically necessary. Declaration of Robert Goldbeck ("Goldbeck Decl."), Ex. B, Encore Plan Summary Plan Description ("SPD") at 34, ECF 40-2. The Plan is, after all, a medical benefits plan. As relevant here, members can demonstrate medical infertility by attempting conception for a defined period by effecting egg-sperm contact, whether through unprotected sexual intercourse or through donor insemination. *Id.* at 11. That standard applies to all members without regard to the member's sexual orientation, the sex of the member's sexual partner, or even the presence or absence of a sexual partner.

Plaintiff nonetheless contends that "[o]n its face, Aetna's Infertility Policy differentiates between members who engage in 'heterosexual sexual intercourse' with a partner and those who do not," and that it privileges "a cisgender member in a heterosexual relationship" over "an LGBTQ member in a same-sex relationship." Opp. 9. But those are Plaintiff's words, not the policy's: the policy makes no reference to "cisgender members," "heterosexual relationships," "LGBTQ members," or "same-sex relationships." Mot. 6 n.6 (quoting text of operative policy); *contra* Opp. 4, 14. Nor does the policy's acknowledgment of different pathways to achieve egg-sperm contact

hinge the benefit itself on a member's sex or sexual orientation.[2] Because the policy is properly before this Court, the Court can—and should—reject Plaintiff's arguments blinking away its plain terms. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

### (ii) The Plan and Policy Do Not Uniquely Burden LGBTQ Members.

Plaintiff next argues that the policy imposes outsized burdens on LGBTQ members relative to cisgender members in opposite-sex relationships. Opp. 8. This theory is functionally indistinguishable from a "disparate impact" theory that Plaintiff has waived. *See* Opp. at 10 n.9. And it is wrong in any case. All members have the burden of showing medical infertility, and those burdens affect both members in the "protected group" and those outside of it. Plaintiff does not plausibly allege that the burdens of demonstrating a *medical* inability to conceive for women in same-sex relationships are the policy's doing.

The Plan provides infertility benefits to all members who can demonstrate medical necessity, without regard to sex or sexual orientation. Plaintiff does not contend (nor can she) that the Plan facially or in practice prevents women in same-sex relationships from receiving those benefits. Rather, she complains that *eligibility* for these benefits is dependent upon a *medical* diagnosis of infertility. According to Plaintiff, requiring women in same-sex relationships to have a medical infertility diagnosis is discriminatory because, regardless of whether either partner is medically infertile (*i.e.* unable to achieve conception through egg-sperm contact after a certain period of time), a same-sex couple cannot conceive a child without assisted egg-sperm contact. At bottom, Plaintiff contends that women in same-sex relationships should be treated *differently* and *exempted* from establishing medical infertility because they, as a practical matter, are unable to conceive without assistance. But plan sponsors may permissibly choose to offer only a benefit for *medical* infertility, and they may likewise condition the availability of that benefit on non-discriminatory criteria such as medical necessity. After all, the purpose of a medical benefits plan

---

[2] An older version of the policy referred to "heterosexual intercourse," but that simply describes one method of egg-sperm contact. Mot. 5-6. The current policy refers directly to "egg-sperm contact," and Plaintiff herself asserts that the current version of the policy simply clarifies the prior version. *See* Opp. 4 ("In January 2023, Aetna altered the language but not the substance of its definition of 'infertile' in its Infertility Policy.").

is to cover the costs of treatment associated with medical issues.

Courts have repeatedly found similar policies to be facially neutral, even where health plans limit or exclude coverage for treatments disproportionately used by a protected class. *See, e.g.*, *Polonczyk v. Anthem BlueCross & BlueShield*, 586 F. Supp. 3d 648, 657 (E.D. Ky. 2022) ("Given the Plan's limited allowance for any cosmetic procedures, regardless of a participant's status as a transgender or non-transgender individual, it cannot be inferred that by simply denying benefits to Plaintiff, Defendants were intentionally discriminating on the basis of sex."); *Weinreb v. Xerox Business Services, LLC Health and Welfare Plan*, 323 F. Supp. 3d 501, 505-07 (S.D.N.Y. 2018) (rejecting Section 1557 claim over policy that barred women from obtaining fentanyl treatments for sex-specific disease where policy covered fentanyl treatments only for breakthrough cancer pain, without explicit reference to sex); *Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 739 (N.D. Ill. 2017) (construing Section 1557 claim as a nonviable "disparate impact" claim where plaintiffs alleged that their health plan discriminatorily failed to cover lactation counseling services, which only women would need). While Plaintiff contends that LGBTQ couples functionally bear greater burdens than couples in opposite-sex relationships, she is drawing the wrong comparison. For the limited question of whether members are considered *medically* infertile under a health plan's terms, the relevant inquiry is whether LGTBQ members are treated worse than non-LGBTQ members who similarly cannot show that they have tried to conceive through unassisted egg-sperm contact. Plaintiff does not and cannot show that the policy fails that test.[3]

Not surprisingly, Plaintiff's claimed legal support is factually inapposite. *See* Opp. 8-9 (citing *Gerdom*, 692 F.2d 602, and *Frank v. United Airlines*, 216 F.3d 845 (9th Cir. 2000)). In both these cases, plaintiffs challenged policies that explicitly set *different* (and more burdensome) standards for women. *Gerdom*, 692 F.2d at 610 (airline's policy imposed weight restrictions only on female flight attendants and not on male employees with similar roles); *Frank*, 216 F.3d at 854

---

[3] Plaintiff's contention that the policy requires members in same-sex relationships to wait longer to establish medical infertility (Opp. 4) is implausible in any case. The policy requires all members to attempt conception through egg-sperm contact for the same number of cycles. *See* Declaration of Connie K. Chan ("Chan Decl."), ECF 45-1, Ex. A, at 7.

(airline's weight policy applied to both genders, but "men could generally weigh as much as large-framed men whether they were large-framed or not, while women could generally not weigh more than medium-framed women"). Neither case finds an analogue here, where the Plan makes no such distinctions, and requires *all* participants to make the same basic threshold showing (demonstrating medical infertility) before qualifying for coverage of infertility treatment.

Inescapably, biological realities mean that even facially neutral policies must and often do impact different participants in different ways; for example, the medical necessity criteria for use of many cancer therapies vary depending on the age of the individual involved, leading to differences in coverage rates for different age groups. But policies do not become discriminatory solely because biological differences may lead to different results for different groups of people. The Supreme Court drove this home in *Nguyen v. INS* when it upheld a statute that automatically recognized a child's U.S. citizenship whenever a U.S. citizen mother gave birth abroad, but required the child to show proof of paternity when the child sought citizenship through their father. 533 U.S. 53, 59-60 (2001). Despite the differential burdens imposed by this statutory scheme, the Supreme Court dismissed the petitioner's equal protection challenge, explaining that statutory regimes may "acknowledge . . . basic biological differences," including the "difference between men and women in relation to the birth process." *Id*. at 73; *see also Geduldig v. Aiello*, 417 U.S. 484, 495-497 (1974) (rejecting equal protection challenge to exclusion of coverage for pregnancy-related conditions because "[w]hile it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification"). Here, different members may undertake egg-sperm contact using different methods, but those differences derive from the fundamental requirements of human conception—not this policy.

### (iii) Plaintiff's Proxy Discrimination Theory Also Fails.

Implicitly recognizing that she must go beyond the face of the policy, Plaintiff next argues that the policy might still run afoul of Section 1557 as an instance of "proxy" discrimination. Opp. 10. This theory fails, too. Under Plaintiff's theory, if certain treatments are not covered by a health care plan, and the lack of coverage disproportionately impacts a particular group, it amounts to

intentional discrimination. But the policy does not become discriminatory by requiring members to demonstrate the medical necessity of a given treatment, even if establishing medical necessity might expose certain members to higher out-of-pocket costs. *See Weinreb*, 323 F. Supp. 3d at 505 (dismissing Section 1557 claim based on failure to cover medication for a disease affecting only women because the plaintiff failed to plausibly allege "Defendants' intentions to interpret and apply the guidelines in a discriminatory way"); *Briscoe*, 281 F. Supp. 3d at 739 (dismissing Section 1557 claim based on plan's exclusion of lactation counseling services, which could have impacted only women, because plaintiffs did not plausibly allege "intentional" discrimination).

Again, Plaintiff's cited authorities cannot save her claim. The Ninth Circuit's "proxy discrimination" holding in *Hecox v. Little* rested on a finding that the relevant statute was "carefully drawn to target transgender women and girls." 2023 WL 5283127, at *10 (9th Cir. Aug. 17, 2023). Similarly in *Rice v. Cayetano*, 528 U.S. 495 (2000), the Supreme Court found that Hawaii had intentionally used "ancestry" as a proxy for race. *Id.* at 514. Moreover, in both *Hecox* and *Rice*, the legislative history of the challenged statutes revealed the respective state legislatures' *intent* to use the "proxy" to target the affected groups. *See Hecox*, 2023 WL5283127, at * 8 (observing that "[d]uring the legislative debate on H.B. 500, the Act's supporters stated repeatedly that the Act's purpose was to ban transgender women athletes from participating on female athletic teams in Idaho"); *Rice*, 528 U.S. at 515-16 (examining prior versions of the statute, which clarified drafters' intent to target *race* rather than the criteria that appeared on the face of the statute). Plaintiff makes no such allegations here, nor could she: the policy's infertility definition simply follows medical guidelines. *See* Mot. 5 n.5.

Furthermore, unlike the classifications in *Hecox* and *Rice*, the policy's neutral criteria cannot be described as "almost exclusively indicators of membership in the disfavored group." *See Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) ("proxy" must be "so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group."). Many heterosexual women without a qualifying medical condition would not meet the Plan's criteria for

medical infertility without assisted egg-sperm contact. This group includes, for example, members without a sexual partner and heterosexual members who cannot have procreative intercourse with their partner for any number of reasons, such as geographic distance or medical conditions. *See* Mot. 10. Plaintiff finds these examples "irrelevant," Opp. 11, but the fact that many people outside of the "protected group" are affected by the infertility policy in precisely the same way is plainly relevant to whether the policy uses a "proxy" for discrimination; the "close[ness]" of the "associat[ion]" *is* the test, so a policy that sweeps in members *outside* of the "disfavored" group cannot be facially discriminatory. *See Pac. Shores*, 730 F.3d at 1160 n.23.

Despite Plaintiff's protestations, these individuals are unquestionably "similarly situated," because these are all individuals who must attempt egg-sperm contact through methods other than heterosexual intercourse. The policy is agnostic as to whether any member—male, female, heterosexual, or otherwise—has a "partner." All that matters is whether the member has a medical diagnosis of infertility. A single heterosexual woman would have to go about proving infertility in the same way as Plaintiff would—by attempting conception through assisted egg-sperm contact for the requisite period. *See supra* at 3-4.[4] So would a member in a couple where one partner has a sexually transmitted infection necessitating the use of protection. Plaintiff points to the policy's carve-outs for "medically refractory erectile dysfunction or vaginismus preventing intercourse" as evidence that the policy offers favorable treatment to heterosexuals unable to achieve unassisted egg-sperm contact. Opp. 12. But these exceptions simply recognize two *medical* reasons why a member might be unable safely to achieve egg-sperm contact (one of which applies to women regardless of sexual orientation). There are a variety of *non-medical* reasons why heterosexual members might not be able to achieve egg-sperm contact, and the policy equally applies to them. Ultimately, the members that *are* similarly situated to Plaintiff—all members that cannot achieve

---

[4] Plaintiff's cases all concern policies that discriminated based on gender "plus" some other factor. Opp. 11-12 (citing *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1048 (10th Cir. 2020), *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971), and *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991)). Those cases are inapposite here, where the Policy distinguishes between claimants based *only* on one factor—the medical necessity of the treatment.

unassisted egg-sperm contact—face the same "burdens" as Plaintiff does. It is clear, then, that the policy was not crafted to distinguish between participants based on sex, but on medical necessity.

### B. Plaintiff Does Not Plausibly Allege "Unequal" Enforcement.

In the alternative, even if the policy is facially neutral, Plaintiff claims that she has alleged that Aetna enforces it in a way that intentionally discriminates against LGBTQ members. In support, Plaintiff cites her allegation that Aetna purportedly requires LGBTQ members in same-sex relationships to submit documentation to prove they are medically infertile but allows "cisgender members in a heterosexual relationship" to be "taken at their word." Opp. 13-14 (citing Compl. ¶ 4). Plaintiff's unequal enforcement theory is no more than a challenge to the policy's terms by another name, and at a minimum it also misstates the Plan documents.

The policy nowhere provides that heterosexual members will be "taken at their word" where LGBTQ members are not. In reality, the Plan requires *all* members to see a provider, receive a diagnosis of medical infertility, and submit proof of medical infertility. SPD at 10.[5] The claims for both LGBTQ members in same-sex relationships and cisgender members in a heterosexual relationship must be truthful, and supported by adequate documentation. *See* SPD at 49 ("We may immediately end your coverage if you commit fraud *or you intentionally misrepresented yourself when you applied for or obtained coverage*." (emphasis added)). The Plan's actual terms settle the question whether Plaintiff has adequately pled a claim of "unequal enforcement." It is Plaintiff that seeks to mandate selective enforcement of the Plan, by demanding an exemption from the requirement to prove medical infertility.

\*   \*   \*

This Court should reject Plaintiff's attempt to satisfy Section 1557's pleading standard by evasively labeling her "disparate impact" theories as "intentional discrimination." Eligibility for the Plan's infertility benefits is determined without regard for a member's sexual orientation or

---

[5] Plaintiff cannot plausibly allege that Aetna imposes different requirements on members, because all members must use the same physician-executed precertification form when seeking coverage for infertility services. *See Infertility Services Precertification Information Request Form*, Aetna, https://www.aetna.com/content/dam/aetna/pdfs/aetnacom/pharmacy-insurance/healthcare-professional/documents/infertility-services-precertification-request-form.pdf.

gender; the Plan's definition of medical infertility based on efforts at "egg-sperm contact" reflects no more than the biological requirements for conception for all members. Because Plaintiff has failed to plead intentional discrimination, the Court should dismiss Plaintiff's Section 1557 claim.

## II. PLAINTIFF'S FAILURE TO JOIN A NECESSARY AND INDISPENSABLE PARTY PRECLUDES RELIEF ON HER CLAIMS AND CONFLICTS WITH ERISA.

Plaintiff has not only sued the wrong party, *see infra*, Section III, but has failed to join the *proper* party, so Rule 12(b)(7) requires dismissal, too. Where a party (1) is "necessary" to the action, (2) cannot feasibly be joined, and (3) is "indispensable" to the action such that the case should not "proceed without the absent party," the case must be dismissed. *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012) (interpreting Fed. R. Civ. P. 19). All three elements are met here.

### A. Encore Is a Necessary Party.

Plaintiff's Opposition clarifies that she is *not* seeking benefits offered by the Plan, and concedes that a straightforward application of the Plan documents affirmatively forecloses her from obtaining the infertility benefits she sought. *Compare* Opp. 25 ("Plaintiff does not contend that Aetna incorrectly administered the Plan, nor is Plaintiff seeking to recover benefits."), *with* Compl. ¶¶ 85, 91; *id.* Prayer for Relief ¶ C. While this concession means that Plaintiff is not seeking ERISA benefits, it only reinforces that Encore is a "necessary" party in this litigation and that her claims would require Aetna to violate its duties under ERISA.[6]

As the Plan sponsor, Encore (not Aetna) decides which benefits to offer Plan participants. Goldbeck Decl., Ex. A, Master Services Agreement ("MSA") Art. 3.01, ECF 40-2 (Encore "retains

---

[6] Plaintiff's Opposition confuses *preemption* (i.e. when a federal law trumps a state law via the Supremacy Clause) with *preclusion* (i.e. when one federal law establishing a comprehensive scheme displaces other federal laws that would frustrate congressional policy). Opp. 24; *see Colum. Exp. Terminal, LLC v. Int'l Longshore & Warehouse Union*, 23 F.4th 836, 843 (9th Cir. 2022). As established in Aetna's motion, ERISA's requirement that participants in ERISA plans bring challenges to benefits determinations through ERISA's comprehensive remedial structure has preclusive effect. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). Plaintiff now disavows that she is seeking recovery of benefits afforded by her ERISA plan, but as explained in the text, the upshot is that her claims therefore seek to impose conflicting duties on Aetna.

complete authority and responsibility for the Plan, its operation, and the benefits provided thereunder"); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78-79 (1995) ("[P]lan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."). The "court cannot accord complete relief among existing parties" without Encore's participation because Plaintiff seeks a new benefit that only Encore can provide. Fed. R. Civ. P. 19(a)(1)(A). "ERISA . . . requires plans to be administered consistent with their terms," *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 591 (8th Cir. 2022), and thus Aetna, as a third-party administrator, has no right to unilaterally alter the benefits offered under the Plan. *See, e.g., Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 150 (2001) (recognizing that plans must "be administered, and benefits be paid, in accordance with plan documents").

The Plan defines "infertility" as, in relevant part, a "disease defined by the failure to become pregnant: . . . For a female without a male partner, after . . . at least 12 cycles of donor insemination if under the age of 35 [or] 6 cycles of donor insemination if age 35 or older." SPD at 57. The fundamental Plan changes Plaintiff demands can only be accomplished by amending the Plan's governing documents, which can be done only with the Plan's sponsor's involvement. And absent a change to the Plan itself, her action proposes to subject Aetna to duties that cannot be reconciled.[7]

To argue otherwise, Plaintiff claims that the Court "must . . . accept[] as true" her unsupported allegation that "Aetna is responsible for designing the discriminatory Infertility Policy and incorporating it into the Plan." Opp. 16. First, Plaintiff ignores that the Court may also consider extrinsic evidence on a Rule 12(b)(7) motion, *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960), so this Court need not (and cannot) merely accept allegations as true when they are plainly controverted by evidence properly before this Court. *See Potter v. Chevron Prods. Co.*, 2018 WL

---

[7] Plaintiff apparently sees no issue with imposing contradictory legal demands on a third-party administrator, arguing simultaneously that (1) Section 1557 requires Aetna to disregard the Plan's terms governing "medical necessity" determinations for infertility treatments, and (2) Encore need not "reform the terms of the Plan" to achieve that result. Opp. 17-18. Under Plaintiff's imagined legal regime, administrators would be liable *regardless* of their actions—either under Section 1557, or under ERISA for failing to administer plans according to their documents, *see* 29 U.S.C. § 1104(a)(1)(D). Even if this Court accepts that legal theory, the critical point for *this* motion is that *none* of these issues can (or should) be resolved without Encore's participation.

4053448, at *4 (N.D. Cal. Aug. 24, 2018).[8]

Second, Plaintiff is simply wrong that the benefits remedy she seeks could be obtained from Aetna alone. Evidence that is properly before the Court (including evidence submitted in opposition by *Plaintiff*, *see* Chan Decl., Ex. A) affirms that Encore is the party "responsible" for the contours of the Plan's infertility policy. Under the MSA, Encore, as Plan Administrator, "retains complete authority and responsibility for the Plan, its operation, and the benefits provided thereunder." MSA, Art. 3.01. Aetna's responsibility to determine eligibility for benefits under the Plan or review denied claims does not extend to alterations of the *provisions* of the Plan; Aetna must act "in a manner consistent with the documents and instruments governing the Plan." *Id.* Art. 3.02; *see* 29 U.S.C. § 1104(a)(1)(D).

Plaintiff latches onto the policy to argue that relief against Aetna alone would be sufficient, but an order enjoining Aetna to alter Medical Clinical Policy Bulletin ("CPB") 0327 would not provide "complete relief" to Plaintiff (or any member of the proposed class). Rather, CPB 0327, by its own terms, merely provides information on how Aetna makes certain coverage decisions *pursuant to* Plan requirements. *See* Chan Decl., Ex. A. In fact, CPB 0327 affirmatively disclaims any notion that it is an authoritative source for whether any particular benefit is covered or excluded under the terms of any particular plan; it states that "[d]efinitions of infertility may vary due to . . . *plan customization*," and notes that "[a]ll coverage is subject to the terms and conditions of the plan." *Id.* at 3 (emphasis added).[9] Plaintiff's claim for benefits necessarily implicates the Plan (and the Plan's coffers, since the Plan is self-funded by Encore, *see* Mot. 15 and n.13), so Encore must

---

[8] Even in the Rule 12(b)(6) context, courts should not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit," or accept allegations that are "conclusory" or dependent on "unwarranted deductions of fact" or "unreasonable inferences." *Sprewell*, 266 F.3d at 988.

[9] *See also Acknowledgment of Terms and Conditions*, *Medical Clinical Policy Bulletins,* Aetna, https://www.aetna.com/health-care-professionals/clinical-policy-bulletins/medical-clinical-policy-bulletins.html ("If there is a discrepancy between a Clinical Policy Bulletin (CPB) and a member's plan of benefits, the benefits plan will govern."). The provisions of the governing documents thus affirmatively refute Plaintiff's allegation that "Aetna requires those buying its TPA services to agree to the terms set forth [in the CPBs]," Opp. 3.

be involved.[10]

Nor can Plaintiff obtain "complete relief" on her claim for *injunctive relief* without Encore's participation, as she claims. Opp. 17-18. In so arguing, she fails to connect the proposed injunction to an injury *redressable* by that relief. Plaintiff purports to seek an injunction preventing Aetna from designing or administering plans adopting an identical infertility policy as Encore's, and expressly disclaims a desire to "enjoin Encore or reform the terms of the Plan." Opp. 17-18. But that injunction would be insufficient to remedy her claimed injuries, precisely *because* only Encore can provide the remedy she seeks (benefits coverage and payments). The inescapable conclusion is that Encore is a necessary party who must be joined for this litigation to proceed.

### B. Encore Cannot Feasibly Be Joined.

The conclusion that an absent party *must be* joined does not necessarily imply that the absent party *can be* joined, as the Federal rules expressly contemplate; here, Encore cannot feasibly be joined to this litigation because Plaintiff's complaint lacks allegations sufficient for this Court to conclude that Encore is subject to personal jurisdiction in this district, or that venue would be proper here. *See E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005).

### C. Encore Is Indispensable, and the Action Must Be Dismissed.

For the same reasons that Encore is "necessary," *see supra*, Section II.A, it is also indispensable to this action. *See also* Mot. 16-19. Rule 19 directs courts to consider four factors when determining whether a case should be dismissed due to the absence of a necessary party: the potential for prejudice to the parties or the absent (and necessary) party, possible means of avoiding that prejudice, whether a judgment would be adequate in the absence of the necessary party, and whether the plaintiff would have an alternative remedy (or an alternative forum) in the event of dismissal. Fed. R. Civ. P. 19(b). These factors favor dismissal here.

---

[10] Plaintiff relies on *Tovar v. Essentia Health*, 857 F.3d 771 (8th Cir. 2017) and *C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) to argue that Encore need not be joined, but neither decision discusses Rule 19. *Tovar* moreover involved a fully-insured plan, where the defendant had responsibility for paying benefits, and where the plan sponsor and third-party administrator were joined in a single action. 857 F.3d at 778.

Plaintiff argues that "equity and good conscience" counsel against dismissal, Opp. 22, but Plaintiff sidesteps the relevant facts, which point to the opposite conclusion. At the outset, proceeding without Encore would be futile, *see supra*, Section II.A. But even setting that threshold issue aside, Encore would be prejudiced as an absent party here.[11] If Plaintiff were to prevail, Encore would be exposed to follow-on litigation (which may risk inconsistent judgments and legal obligations), Mot. 18; it may need to alter its contractual relationship with defendants, Opp. 20-21; and it may have to take any number of actions pursuant to the Court's judgment (including, presumably, paying for benefits it otherwise would not have covered). And, critically, dismissal under Rule 12(b)(7) would not prejudice *Plaintiff*, because her suit may be litigated in an alternate forum. In analogous contexts, courts have repeatedly held plan sponsors to be "indispensable." *Baird v. Blackrock Institutional Tr. Co., N.A.*, 2020 WL 7389772, at *11 n.15 (N.D. Cal. Feb. 11, 2020) (noting that plan fiduciaries are "likely indispensable parties to an action that would affect their agreements"); *Sypher v. Aetna Insurance Co.*, 2014 WL 1230028, at *4 (E.D. Mich. Mar. 25, 2014) (deeming plan sponsor/administrator in a self-insured plan an "[i]ndispensable [p]arty" under Rule 19). As in those cases, Encore is a necessary and indispensable party who cannot feasibly be joined, and this suit should be dismissed.[12]

### III. AETNA INC. SHOULD BE DISMISSED.

Regardless of the Court's holdings on the other issues in the case, Plaintiff's claim against Aetna Inc. should be dismissed. Plaintiff's argument against the dismissal of Aetna Inc. is limited to the proposition that Aetna's argument "rests on extraneous materials not incorporated into the

---

[11] Rule 19(b) makes no reference to a "claim" to an interest; prejudice to absent parties is thus relevant under Rule 19(b) regardless of whether the absent party has expressly "claimed" an interest. *See Philippines v. Pimentel*, 553 U.S. 851, 868 (2008) ("[I]n the Rule 19(b) inquiry, a court must examine, to some extent, the claims presented and the interests *likely to be asserted* both by the joined parties and the absent entities or persons." (emphasis added)).

[12] This is not a "public rights" case, *contra* Opp. 24. This case may well be important to the litigants, and may even garner interest from non-parties, but that is not the test. At its core this case "is a private one focused on the merits of [Plaintiff's] dispute," and regardless, poses a "significant threat" to the private interests of the absent party, Encore, in that it could be exposed to burdensome (and potentially conflicting) legal and financial obligations. *See Kescoli v. Babbitt*, 101 F.3d 1304, 1311-12 (9th Cir. 1996).

complaint," and thus cannot be considered on a Rule 12(b)(6) motion. Opp. 2. Plaintiff's "motion to strike" is improper,[13] but even without considering the facts set out in the Allocca Declaration, Plaintiff's complaint fails to state a claim against Aetna Inc. Plaintiff includes no specific factual allegations concerning Aetna Inc. Plaintiff mentions "Aetna Inc." four times in her complaint (Compl. ¶¶ 1, 14, 15 & 52), but does not set forth any specific factual allegations about Aetna Inc.'s role in the allegedly discriminatory scheme apart from its status as the owner of Aetna Life Insurance Company, *id.* ¶¶ 14-15. Plaintiff's claim in opposition that her "allegations are all pled jointly against both Defendants," Opp. 25, is inadequate to save her deficient pleading. A plaintiff cannot meet her pleading burden by "lump[ing] Defendants together" and asserting "opaque, scattershot factual allegations" like those lodged at Aetna Inc. here. *See Bonnette v. Dick*, 2020 WL 3412733, at *3 (E.D. Cal. June 22, 2020). The vast majority of Plaintiff's allegations against Aetna Life Insurance Co. could not *possibly* apply to Aetna Inc., which did not execute the contracts or conduct the insurance activities at issue in this litigation. Even if Plaintiff's claims against Aetna Life Insurance Co. are viable (which they are not), Aetna Inc. must be dismissed from this action.

## CONCLUSION

For the reasons stated herein, Aetna respectfully requests that the Court grant this Motion and dismiss Plaintiff's complaint in its entirety.

Respectfully submitted,

Dated:  September 25, 2023          **O'MELVENY & MYERS LLP**

  */s/ Susannah K. Howard*
Susannah K. Howard

*Attorneys for Defendants*

---

[13] In a footnote, Plaintiff moves to strike the Allocca Declaration, which outlines the relevant facts about Aetna Inc.'s status as a holding company that is not engaged in the business of insurance. Opp. 25 n.29. Plaintiff's "motion" does not comport with the Federal Rules, and should not be considered. *See Surman v. UPMC Presbyterian Shadyside*, 2018 WL 4901107, at *5 n.2 (W.D. Pa. Oct. 9, 2018) (declining to consider defendant's motion to strike because defendant "UPMC improperly raise[d] its 'motion' to strike in a footnote") (citing Fed. R. Civ. P. 7(b)); *Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1127, 1131 (W.D. Wash. 2007).