Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

MARA BERTON, ON BEHALF OF      )
HERSELF AND ALL OTHERS         )
SIMILARLY SITUATED,            )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. CV 23-01849-HSG
                               )
AETNA, INC., ET AL.,           )
                               )
          Defendants.          )
_____)

                          Oakland, California
                          Thursday, October 12, 2023

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    KATZ BANK KUMIN LLP
                    150 California Street, 16th Floor
                    San Francisco, CA  94111
              BY:   **REBECCA PETERSON-FISHER, ESQUIRE**

                    ALTSHULER BERZON LLP
                    177 Post Street, Suite 300
                    San Francisco, CA  94108
              BY:   **CONNIE K. CHAN, ESQUIRE**
                    **BARBARA CHISHOLM, ESQUIRE**
                    **ROBIN THOLIN, ESQUIRE**

                    NATIONAL WOMEN'S LAW CENTER
                    1350 I Street NW, Suite 700
                    Washington, DC  20005
              BY:   **ALISON TANNER, ESQUIRE**

Reported By:        Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                    Official Reporter

**APPEARANCES CONTINUED:**

For Defendants:

                    O'MELVENY & MYERS LLP
                    1625 Eye Street, NW
                    Washington, DC  20006
        **BY:  MEAGHAN VERGOW, ESQUIRE**

                    O'MELVENY & MYERS LLP
                    Two Embarcadero Center, 28th Floor
                    San Francisco, CA  94111
        **BY:  SUSANNAH HOWARD, ESQUIRE**

| | |
|---|---|
| 1 | **Thursday - October 12, 2023**                                    **2:29 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | **THE CLERK:**  Your Honor, we're calling CV 23-1849, |
| 5 | Berton vs. Aetna, Inc., et al. |
| 6 | Please step forward and state your appearances for the |
| 7 | record, please. |
| 8 | **MS. VERGOW:**  Good afternoon, Your Honor.  Meaghan |
| 9 | Vergow from O'Melveny & Myers for the defendants. |
| 10 | **THE COURT:**  Good afternoon. |
| 11 | **MS. HOWARD:**  Good afternoon.  Susannah Howard of |
| 12 | O'Melveny & Myers for the defendants. |
| 13 | **THE COURT:**  Good afternoon. |
| 14 | **MS. PETERSON-FISHER:**  Good afternoon, Your Honor. |
| 15 | Rebecca Peterson-Fisher of Katz Bank Kumin LLP for the |
| 16 | plaintiff, Mara Berton, who is present in the courtroom. |
| 17 | **MS. CHAN:**  Good afternoon, Your Honor.  My name is |
| 18 | Connie Chan of Altschuler Berzon for plaintiff, Mara Berton, |
| 19 | and with me is also my co-counsel from Altschuler Berzon, B.J. |
| 20 | Chisholm and Robin Tholin. |
| 21 | **MS. TANNER:**  Thank you, Your Honor.  Alison Tanner for |
| 22 | plaintiff, Mara Berton. |
| 23 | **THE COURT:**  Good afternoon. |
| 24 | All right.  So we're here for a hearing on the defendants' |
| 25 | motion to dismiss.  I don't know who is taking the lead for the |

1   plaintiffs.

2          **MS. TANNER:**  Your Honor, I will be arguing the

3   12(b)(6) part of the motion, and my co-counsel, Connie, will be

4   handling the 12(b)(7) and pre-ERISA preemption.

5          **THE COURT:**  All right.  So I've reviewed the papers

6   and a number of the cases, and obviously it's a very

7   interesting and significant issue and one that I think courts

8   are working through in different cases around the country.

9          Let me do this.  I think -- I understand it's the

10  defendants' motion, but I have at least a few preliminary

11  questions that I think are for the plaintiff.  And then I'll

12  allow each of to you make your argument.

13         I have obviously read the briefs.  I definitely don't want

14  a speech or a recitation of the briefs, but -- and I'll

15  probably have some questions for each of you as we go through

16  that process, but -- so let me start with the plaintiff,

17  though.

18         And I assume that there's no dispute from your perspective

19  that the defendant could make the decision -- can make the

20  decision to cover only medically diagnosed infertility.  What I

21  mean by that is I think a lot of the dispute is about how

22  that's defined, but it seems to me that they have the right, in

23  terms of making coverage decisions, to limit coverage to

24  instances in which they deem it medically necessary.

25         Is there a dispute about that premise?

1      **MS. TANNER:**  Your Honor, Aetna has raised as a defense
2   here that their policy is about their definition of "medical
3   necessity," and that is simply a defense.  It does not
4   negate --
5      **THE COURT:**  But stepping back, this is a basic
6   question, and the more straightforward answer you can give me
7   the better off you'll be.
8      They don't have to cover all infertility treatments.  They
9   can say, What we cover is medically necessary infertility
10  treatments.  Is there a dispute as to that?
11     **MS. TANNER:**  No, Your Honor.  They have to provide
12  equal benefits on the basis of sex.
13     **THE COURT:**  Understood.  And so then the second
14  question is what is the remedy that you're seeking?
15     **MS. TANNER:**  So the remedy that we would be seeking
16  here is for women who are in same-sex relationships, so those
17  who cannot conceive within their relationship, to have, just as
18  women who are in heterosexual relationships who cannot conceive
19  in their relationship, immediate access to their fertility
20  benefits.
21     **THE COURT:**  And so that would mean that the -- that
22  Aetna would be required to cover the cost of the insemination
23  treatment up front.
24     **MS. TANNER:**  Correct, Your Honor.  And this is at the
25  initial pleading stage.  So at further discovery, we may find

1    additional facts about the relative burdens upon the parties,

2    and plaintiffs may alter their position.

3           **THE COURT:**  I'm not sure about that.  You brought your

4    claim, and you've got your theory, don't you?

5           **MS. TANNER:**  Yes.  Yes, Your Honor.

6       I'll say just a preview of what we intend to show through

7    discovery.  We do not think that Aetna's policy follows the

8    current medical standards.  Their unsupported statement within

9    their brief that their policy does, in fact, do so is just

10   that, a statement without support.

11          **THE COURT:**  All right.  And the premise for the remedy

12   that you just laid out, as I understand it, is that under the

13   policy, there are two prongs for establishing medical diagnosis

14   of infertility.  One is based on intercourse over a period of

15   time without conception.  The other is based on essentially

16   artificial insemination attempts over a period of time without

17   conception.  And your claim is based on the theory that that is

18   discriminatory because women who can avail themselves of the --

19   what was in the previous version of the policy called

20   "heterosexual sexual intercourse" can establish medical --

21   medically diagnosed infertility without paying anything, but

22   women in same-sex relationships don't have that avenue

23   available to them.  The only avenue available to them is a

24   treatment of insemination that can be costly, and so your

25   theory, it sounds like, is to -- is that to put those two

1   groups of women on equal footing for women in same-sex

2   relationships, the insemination costs would be covered, even if

3   they aren't for others.  Is that it?

4          **MS. TANNER:**  Your Honor, I think that my colleagues

5   representing Aetna's briefing has made a bit unclear what is

6   actually shown when a heterosexual couple cannot achieve a

7   pregnancy via heterosexual sex, so I'd like to take a moment to

8   explain that.

9          **THE COURT:**  Well, first answer my question.

10          **MS. TANNER:**  Yes.  So I think that it's important to

11   note that a woman can -- a heterosexual woman can receive

12   benefits under Aetna's policy even if there is nothing

13   physiologically wrong with her causing infertility, and this is

14   because of what is proven by failure to achieve a pregnancy via

15   heterosexual sex.

16      So when a couple cannot achieve a pregnancy via

17   heterosexual sex, it is possible that the problem is with the

18   woman so there is a problem with either her ovulation or with

19   her egg quality.  However, it is also possible that the problem

20   is with the male partner, either with his sperm quality or his

21   sperm motility.

22      And then there is a third possibility altogether, which is

23   that the couple is simply not engaging in sexual intercourse in

24   a manner that is likely to achieve a pregnancy.  So Aetna's

25   policy doesn't require that individuals in heterosexual

relationships engage in heterosexual sex that is timed with ovulation or otherwise define "heterosexual sex" in a manner that is likely to achieve a pregnancy.

Thus, a woman who is in a heterosexual relationship might be perfectly healthy and still be able to access her benefits because she is in that heterosexual relationship.  But because a woman like Mara is in a relationship with her partner June, she is automatically denied her benefits and, instead, required to prove that she as an individual has individual infertility.

Aetna treats infertility as a couple's disease for heterosexuals but as an individual disease for people in LGBTQ relationships.

**THE COURT:**  All right.  But just going back to the question I asked, so the premise for your theory, though, is that because of the -- what you're alleging to be the discrimination, the remedy is that -- what?  For women in same-sex relationships, the insemination treatment would be covered as a benefit, that that would be covered as a benefit for everyone, that that's -- what is the basis for the remedy the way you've framed it?

**MS. TANNER:**  The remedy here -- because our class is women in relationships with women or others who are egg-producing, the remedy is for that class of individuals to have immediate access to their fertility benefits because they are similarly situated to women in heterosexual relationships

1   who cannot conceive with their partners.  They know this

2   already.  It's because they do not have the gametes necessary

3   to achieve a pregnancy without medical assistance.

4         **THE COURT:**  All right.  In your world with that

5   remedy, would heterosexual women be entitled to that access as

6   well, that there would be essentially a -- that there would be

7   two free prongs, I guess for want of a better way to put it?

8   That one is the intercourse prong and one is the insemination

9   prong.  But for all members -- for all people covered by the

10  plan, all women covered by the plan, the insemination course

11  would be covered or not?

12        **MS. TANNER:**  So for -- are you asking for women in

13  heterosexual relationships?

14        **THE COURT:**  Exactly.

15        **MS. TANNER:**  Yeah.  So for women in heterosexual

16  relationships, they would not necessarily -- they would need to

17  show that they needed the cycles of artificial insemination as

18  treatment under this theory of -- of remedy.  And so that would

19  be why they would still have the 6- or 12-cycle requirement,

20  whereas for women in queer relationships, they have shown that

21  they need this as treatment by the nature of their

22  relationship.

23        **THE COURT:**  All right.  I see.

24     Let me -- those were the preliminary questions that I had,

25  and they're helpful.  It's the defendants' motion, so why don't

1    I let you argue first, and, as I said, please don't repeat the

2    entirety of the papers, but if there are points that you want

3    to amplify, this is the best time to do that.

4            **MS. VERGOW:**   Thank you, Your Honor.

5        I'll start where you did, Your Honor, and that's to say

6    that this benefit -- the plan that covers the plaintiff

7    includes a benefit for the treatment of the disease of medical

8    infertility, and plaintiff does not contend that she suffers

9    from the disease of medical infertility.

10       I was interested to hear plaintiff's counsel indicate that

11   she understands the Complaint to allege that the definition

12   incorporated into the plan and this policy does not follow

13   medical standards.  I don't see that pleaded into the

14   Complaint.  I think that would be interesting if it were.

15       My understanding is that the definition follows

16   well-accepted medical standards, and that plaintiff doesn't

17   allege to the contrary.

18       The plan here follows directly the requirements of the

19   policy, which, in turn, follow well-accepted medical standards,

20   and that requires that for a diagnosis of the disease of

21   medical infertility, the member show that they have attempted

22   conception through egg/sperm contact for a fixed period of

23   time.  That standard, the neutral medical necessity definition

24   apply equally to all members, regardless of their sex or their

25   relationship status.

1    **THE COURT:**  Right.  Although I think that's part of

2    where we are going to get into, I think, a side line.  It's a

3    motion to dismiss at this point, so what they're, I'm sure,

4    going to say is, Well, that's not in the Complaint, all that

5    stuff about medical definition -- and I think they're probably

6    right.  At this point I have to take the Complaint on its four

7    corners; right?

8        **MS. VERGOW:**  That's correct, although I think it's

9    undisputed that the policy and the plan are incorporated into

10   the Complaint and that each of them profess to follow medical

11   standards, so I'll leave it at that.  But Your Honor should

12   absolutely take the Complaint as it's pleaded by plaintiffs,

13   and we're not urging you to depart from that in any respect.

14    The way I think about access to this benefit -- and I

15   agree, it's sort of like a thorny issue to think through.

16   The -- the plan recognizes the biological reality that you need

17   egg/sperm contact to conceive.  One way of doing that is

18   through heterosexual intercourse, but the plan does not limit

19   access to the benefit to the use of heterosexual intercourse,

20   and it recognizes that other members' life circumstances may

21   require access to the benefit using different means.  So it

22   permits that.  It's an accommodation of additional ways of

23   meeting the definition that, to me, reflects inclusion, not

24   exclusion.  This is --

25        **THE COURT:**  Although I think the reason this case was

1   brought is that to exercise one of those avenues that's

2   available to women in heterosexual relationships, there's no

3   associated cost.  I think if Aetna's policy was what was just

4   proposed, which is if you're in a same-sex relationship, then

5   we will cover the cost of the necessary regime that would be

6   needed to then get to the point of saying that there's a

7   medical diagnosis, I don't think we'd be here.

8       I think the reason that the case was brought is that the

9   argument is that, as structured, there is a cost imposed on

10  women in same-sex relationships that isn't on women in

11  opposite-sex relationships to get to the same point of

12  establishing the diagnosis.

13      And so -- and the question is whether that is a violation

14  of Section 1557, but, really, I think that's what it comes down

15  to.

16      **MS. VERGOW:**  I -- I appreciate that.  And the -- the

17  critical issue, from our perspective, is that the -- the

18  requirement here is medical necessity.  That's the gatekeeping

19  for this benefit, and that applies equally.  The medical, you

20  know, definition of the requirement of egg/sperm contact

21  applies equally to all individuals.

22      I also think it's telling that the remedy, as described by

23  plaintiff's counsel, would entail essentially fronting the

24  benefit that's reserved pursuant to the plan sponsor's decision

25  to the treatment of medical infertility and would in effect

1   create an additional benefit, that is, a benefit for fertility

2   aids.

3       There are mandated benefits out there.  We know the ACA

4   requires a variety of benefits to be covered, irrespective of

5   the plan sponsor's choice, but fertility aids are not one of

6   them.  And I'll emphasize, there are states also that have

7   mandated particular benefits, including the benefits that would

8   be necessary to diagnose medical infertility.  California is

9   not one of those states.  So this action, from our perspective,

10  is an effort to create a requirement to, you know, impose an

11  additional benefit under the plan that isn't required by

12  federal law.

13      **THE COURT:**  And what should I make of the point that

14  the plaintiffs made about certain medical conditions being

15  deemed to allow a claimant to forego the intercourse prong,

16  inartful as that may be?  I'm trying to figure out the best way

17  to say it.

18      They noted that there's a portion of the CPB that says,

19  "Aetna considers artificial insemination to be medically

20  necessary for treatment of medically refractory erectile

21  dysfunction or vaginismus, preventing intercourse."  What does

22  that mean and what is the potential relevance of that for this

23  discussion?

24      **MS. VERGOW:**  That means that this is a medical benefit

25  for a disease, and to the extent you can establish that the

1    disease of medical infertility exists through other mechanisms,

2    the plan accommodates that.

3          **THE COURT:**  What are those other mechanisms?

4          **MS. VERGOW:**  There are some that Your Honor just

5    mentioned, and without veering too far outside the Complaint,

6    if a couple or a member were to go to their doctor and consult

7    with them about difficulty achieving conception through

8    egg/sperm contact, the doctor would typically order a series of

9    tests.  They would conduct an interview to understand the

10   patient's medical history and personal history, and part of

11   that testing, if the person was, for example, a single woman,

12   would be to identify other things that could explain the

13   infertility.  The test, the default test of 12 months of

14   attempts at conception through egg/sperm contact is for

15   indeterminate infertility.

16        And, again, I don't want to veer too far outside of the

17   Complaint, but it just means that there are multiple ways of

18   showing that you're eligible for treatment for medical

19   infertility because it's medically necessary in your instance.

20        **THE COURT:**  And so in that circumstance, the claimant

21   is allowed to skip over the trying for X amount of time

22   requirement?

23        **MS. VERGOW:**  In essence, yes, because they have

24   established another reason -- a reason -- there is no reason to

25   wait.  We already know your partner has a low sperm count.

1   There is no reason to wait.  We already know that you're not

2   producing eggs.  There is no reason to wait.  We already know

3   that you have a history of experiencing ectopic pregnancy.  But

4   there is a reason to wait if you don't otherwise know that the

5   person is incapable of conception through egg/sperm contact.

6          **THE COURT:**  All right.  I see.

7      You can continue.

8          **MS. VERGOW:**  Okay.  Well, thank you, Your Honor.

9      I know that my friend is not addressing the 12(b)(7)

10  issues, but I wanted to speak to them just briefly.  And I

11  wanted just to emphasize for the Court that it's important not

12  to underestimate the importance of the ERISA standards to a

13  fiduciary that's required to follow them.

14     As I understand the plaintiff's claim here, a decision in

15  her favor would require Aetna to administer benefits that are

16  not provided for by the plan contrary to its obligations under

17  ERISA to administer benefits in accordance with the plan.  That

18  could expose Aetna to suits from the plan sponsor.  It could

19  expose Aetna to suits from the Secretary of Labor, from other

20  plan participants.  So it's imperative that there not be

21  mutually incompatible duties here.

22     Now, I'm not saying that an ERISA administrator can never

23  be liable under 1557, and I want to make that really clear.

24  Certainly an administrator acting within the parameters of a

25  plan document that exercises their discretion inequitably or

discriminatorily could be subject to 1557 because that's within

their discretion, but here we have a circumstance where the

plan itself, the plan adopted by Encore -- the plan sponsor

itself adopts a definition of "medical infertility" that states

it must be shown through attempts at conception through

egg/sperm contact for a fixed period of time.  That standard

applies to everybody under the plan, and Aetna could not

administer a different benefit without falling afoul of that

plan language.

      **THE COURT:**  All right.  I see.  And, really, with

respect to the underlying substance of the motion to dismiss,

it seems that the -- the nub of the dispute is that you're

saying that it's neither -- that there is no evidence of direct

discrimination and that there is also not an adequately pled

theory of proxy discrimination under these circumstances.

      And how much of your position in that regard is based on,

at a high level, the idea that even if differential costs are

imposed on women in these two different classes, that doesn't

rise to the level of a violation under Section 1557?

      **MS. VERGOW:**  I think that's certainly a dimension of

our argument.  Section 1557 follows the requirements of Title

IX.  Title IX follows consent principle of non-discrimination

requiring intentional discrimination, not a disparate impact.

And the mere fact that the burdens of a plan provision may fall

more heavily on one class of persons over another is not -- not

1  enough to show that the provision was itself adopted for the

2  purpose of discriminating against the protected class.

3      Once, again, here, the way I see this provision is there's

4  a medical benefit, and the benefit recognizes that some means

5  of attempting conception are not going to be available to all

6  plan members.  That's the biological reality.  Members who do

7  not engage in heterosexual intercourse are not going to be able

8  to attempt conception in that way.  So the plan says, Okay,

9  well, we'll give you another route.  You can attempt -- you can

10  meet the same definition as everybody else.  Attempt egg/sperm

11  contact for 12 months, and you, too, can get the benefit.  It's

12  available to everyone on equal terms.

13      **THE COURT:**  But that just has to be done on the

14  claimant's own dime.

15      **MS. VERGOW:**  That's correct.

16      **THE COURT:**  All right.  Why don't I hear from the

17  plaintiffs.

18      **MS. TANNER:**  Thank you, Your Honor.

19      I would like to point out that, first, California law does

20  require fully insured plans to cover some fertility benefits.

21  And, additionally, the Complaint here is about Aetna's design

22  and marketing of its fertility benefit.  So regardless of

23  whether it's required by law for self-insured plans or not, it

24  is Aetna's design of that plan that we are alleging is

25  discriminatory here.

1    I want to also point out that the concern that plaintiff

2    has with this 6 or 12 artificial insemination requirement is

3    greater than the cost.  It also has to do with the fact that 6

4    or 12 cycles of artificial insemination can take far longer

5    than 6 or 12 months of heterosexual sex.  And also it requires

6    often for women in same-sex relationships to defy the

7    recommendations of their doctors and undergo more cycles than

8    they would recommend.

9    I would direct the Court's attention to page 20 of Aetna's

10   CPB.  There Aetna actually has in its own policy a

11   recommendation that women who are younger than 37, after three

12   medicated cycles of IUI, should proceed to IVF, showing that

13   Aetna's own policy finds that more than three medicated cycles

14   of IUI would be futile to continue with.

15   **THE COURT:**  Right.  But that's where -- but I'm trying

16   to understand, so if that is part of your theory -- and I

17   understand that it is -- what is the remedy for that?

18   **MS. TANNER:**  So, again, Your Honor, it is having the

19   immediate access to treatment for art -- of artificial

20   insemination for women who cannot conceive in their same-sex

21   relationship.  That would be directed by their doctor and allow

22   their doctor to determine with them the best course of medical

23   treatment for them, rather than letting Aetna's policy

24   incentivize them to undergo burdensome and sometimes

25   risky-to-their-health treatments.

1      **THE COURT:**  So there would be essentially a

2   requirement that claimants in your client's position would not

3   have to show medical necessity before having access to the

4   insemination treatments?

5      **MS. TANNER:**  It would be a requirement that plaintiffs

6   show what we all know, which is that women in relationships

7   with other women cannot conceive without medical assistance.

8   That is all they would need to show.

9      And under Title VII case law, which the Supreme Court and

10  the Ninth Circuit have directed courts should look to when

11  interpreting Title IX and Section 1557, the proper analysis is

12  looking at the relative comprehensiveness of the benefits that

13  are provided to different categories of people.

14     So this is relevant to arguments made in my colleagues

15  representing Aetna's reply, but I would direct the Court to

16  look at the Title VII and EEOC decisions related to access to

17  contraception and employer health plans.

18     In those cases, courts have determined that when an

19  employer health plan has comprehensive pharmacy benefits but

20  excludes from those benefits contraceptives that are, under

21  pharmacies, only available to women, they are sex

22  discriminatory because they are not equally comprehensive for

23  women.

24     So, too, here.  The fertility benefit is not equally

25  comprehensive for women who are in same-sex relationships

because it is not meeting their medical need that, in reality, is they cannot conceive with their partner.

Moving right along, I think that it's important to note that we have put forward a very straightforward, under *Bostock*, theory of facial discrimination here.  So if the Court were to switch the sex of Mara's partner, she would be able to access her benefits because she cannot conceive with her partner, and so that presents facial discrimination under *Bostock*.

We also have a theory of proxy discrimination because the text of Aetna's policy includes a requirement that one engage in heterosexual intercourse pre-2020 -- or January 2023 and now sexual intercourse that results in egg and sperm contact, which is heterosexual intercourse by another name.

And the Supreme Court held in *Lawrence vs. Texas*, as well as in *Christian Legal Society* that requirements that are based on LGBTQ conduct are similarly just LGBTQ status requirements by a different name.

I would also direct the Court to look at Footnote 23 in *Pacific Shores* which specifically addresses the frequency of over-discrimination when one is dealing with proxy discrimination.  It is actually a token of proxy discrimination.  There are many -- the court analogizes with gray hair, and many people have gray hair far before they're old.  I unfortunately know.

And then, if the Court is interested, I can address the

1    defendant's *Goidel* arguments, but I can also leave them for

2    another day.

3        **THE COURT:**  With respect to your theory of facial

4    discrimination, maybe you can build that out more because

5    essentially what you're saying is -- the framing that you're

6    using is can't access benefits, and it seems to me the way that

7    the benefit is structured, it can be accessed, but there is

8    this period of 6 to 12 cycles of treatment that are required

9    with then a certain result before further benefits can be

10   accessed.

11       So, in your view -- I think it comes back to what I was

12   saying before, but in your view, what is the -- what's the

13   principle that, in your view, would put women in same-sex

14   relationships and women in opposite-sex relationships on the

15   same footing?  What would the policy -- how would the policy

16   look?  How would it be different?

17       **MS. TANNER:**  Yeah.  Again, I think this is about

18   looking at infertility as a couple's disease versus something

19   that is individually diagnosed.  So there is an option for

20   folks in heterosexual relationships to have infertility treated

21   as a couple's disease.  There are various diagnoses that allow

22   one who is in a relationship that is opposite sex to access

23   their fertility benefits when they have no personal individual

24   diagnosis of infertility, medical infertility.

25       However, when someone identifies themselves to Aetna as

1   being in a same-sex relationship, they must always identify

2   individual medical infertility.  That is a different and more

3   burdensome standard, and therefore it violates Section 1557.

4           THE COURT:  And how would the policy look to cure that

5   problem?

6           MS. TANNER:  So to cure that problem, the policy would

7   recognize the straightforward fact that women in same-sex

8   relationships biologically cannot conceive with their partner.

9           THE COURT:  But how would that then look?  How would

10  that flow?  How would the actual policy look?

11          MS. TANNER:  Yes.  I -- I honestly regret not bringing

12  with me the current American Study for Reproductive Medicine

13  definition of "infertility" because it would follow that, which

14  says it is -- inability to conceive either as an individual or

15  with one's partner is infertility.

16          THE COURT:  Which would then flow through how in the

17  policy that we're debating right now?

18          MS. TANNER:  So it would then show -- okay.  We have

19  on page 18 of the Clinical Policy Bulletin, you know -- one of

20  the factors here could be couples that do not have the gametes

21  necessary to reproduce.  So if you're in a relationship with --

22  where both of the partners produce eggs, you have intrauterine

23  insemination is medically necessary.

24          THE COURT:  Okay.

25          MS. TANNER:  Which is, I would say, similar to when

1   there is obstructive azoospermia so a male partner who is

2   unable to produce sperm, further down on this, page 19 of the

3   Clinical Policy Bulletin.  Those are folks who Aetna says are

4   considered immediately eligible for artificial insemination

5   because they're in a heterosexual relationship, so they get

6   those benefits.

7           **THE COURT:**  I see.  Okay.

8       I think those are the questions I had on this issue.  I

9   have a couple -- why don't we hear from your colleague who's

10  speaking to the joinder issue, and then because it's the

11  defendant's motion, I'll let them have the last word.

12          **MS. TANNER:**  Okay.  Thank you very much, Your Honor.

13          **THE COURT:**  You're welcome.

14          **MS. CHAN:**  Thank you, Your Honor.

15      This case is about Section 1557 of the Affordable Care

16  Act, not ERISA.  What I heard Aetna's counsel say was that

17  Aetna's position is that they should not face liability under

18  Section 1557 for their own discriminatory conduct because ERISA

19  precludes plaintiff's claims.  But ERISA itself squarely holds

20  that -- provides that nothing in the subchapter shall be

21  construed to alter, amend, modify, invalidate, impair, or

22  supersede any law of the United States.

23      Several courts have rejected the exact same argument that

24  Aetna is making here.  The court in both *Tovar vs. Essentia*, as

25  well as the court in *C.P. by & through Pritchard vs. Blue Cross*

1    *Blue Shield* -- in both of those cases, the defendants made the

2    same argument that as a third-party administrator, it should

3    not be subject to Section 1557 for its actions in administering

4    a plan that is discriminatory.  And in both of those cases, the

5    courts outright rejected that argument explaining that ERISA

6    and Section 1557 can be harmonized.  They are both federal

7    statutes.

8        **THE COURT:**  Right.  And I agree with that reading of

9    the cases, but they weren't about joinder.  I mean, really the

10   obvious question here is why wouldn't you sue Encore?  I'm

11   assuming it's venue related.

12       It's their plan.  Aetna is the administrator of the plan.

13   Why wouldn't they be part of this case?

14       **MS. CHAN:**  Well, I would like to address that in a few

15   ways, if I may, Your Honor.

16       First, I should have sort of backed up by explaining that

17   plaintiff is suing Aetna under Section 1557 for Aetna's own

18   actions in violation of that statute.  And plaintiff has

19   alleged that Aetna is violating that statute in two ways.

20       **THE COURT:**  I get it.  But I -- there is something at

21   least intuitively logical to the point they're making, which is

22   they're the administrator, and ultimately you are now asking --

23   your colleague was candid about the way that the plan should be

24   reformed by me if I end up agreeing with you at the end of the

25   case.  Why doesn't that require the actual owner of the plan to

1  be part of the case?

2      I mean, yes, I understand that you're arguing that Aetna

3  itself violates the statute, and I fully get that, but in the

4  end, what you want is changes in the plan, and it's Encore's

5  plan.  So why wouldn't Encore appropriately be here?

6          **MS. CHAN:**  I do want to clarify the scope of relief

7  that plaintiff is seeking here because plaintiff is seeking two

8  forms of relief, both of which are authorized by Section 1557,

9  and Aetna does not dispute that.

10      The first is damages, out-of-pocket -- reimbursement for

11  the out-of-pocket cost that she incurred as a result of Aetna's

12  discriminatory acts.  That is a form of relief that Aetna

13  itself can pay out of Aetna's own pockets.  It does not require

14  Encore to be involved.  It does not require a payment of

15  benefits out of the plan.

16      So Encore, as an initial matter, is not necessary to

17  accord plaintiff the relief that she is seeking with respect to

18  damages.

19      With respect to injunctive relief, my co-counsel was

20  explaining the ways in which plaintiff is seeking an injunction

21  against Aetna from continuing to design, market --

22          **THE COURT:**  Counsel, it's just too clever.  Design --

23  they can design, propose, all they want, but Encore has to

24  accept it, and they did.  It's their -- let me -- maybe you

25  can't answer the question.

1    It seems to me the only reason that they're not in the

2    case is because you'd have to sue somewhere else to have them

3    in the case.

4         **MS. CHAN:**  Well, Your Honor, if -- if Encore were, in

5    fact, a necessary party, plaintiff absolutely could join Encore

6    to this case.  I think there's no question that this Court does

7    have personal jurisdiction over Encore.  We submitted evidence

8    in support of that position if the Court were to determine that

9    it were a necessary party.  And venue is also appropriate in

10   this district.  And Aetna really hasn't submitted anything to

11   the contrary to suggest otherwise.  So I don't agree that if

12   Encore were necessary, we would have to relocate this case to

13   another venue.

14        **THE COURT:**  Fair enough.  I wouldn't expect you to

15   concede that, but I've been doing the job long enough that I

16   sort of --

17        **MS. CHAN:**  Of course.

18        **THE COURT:**  -- understand some things.

19   But your point -- and I think I can probably end this part

20   of the discussion with this -- is that even if I were to reach

21   the conclusion that they need to be in the case, I should --

22   the remedy for that is that I order them to be joined.  And

23   then you would do that, and I guess they would fight it if they

24   thought they could fight it.

25   But is that right?  The remedy would not be to dismiss on

1    that ground.  It would be to order joinder of that party.

2         **MS. CHAN:**  That is right if we got to that point, but

3    I do again want to, again, reorient the discussion within the

4    three-part framework.

5         **THE COURT:**  I understand your argument.

6         **MS. CHAN:**  Which I know Your Honor understands, but

7    because Aetna -- because Encore is not a necessary party to

8    this action, under either Rule 19(a)(1)(A) or (a)(1)(B), the

9    Court never even needs to get to step two of the analysis.

10        And I do want to just address, again, why Encore is not

11   necessary for the Court to award plaintiff the injunctive

12   relief that she is seeking.

13        Plaintiff is the master of her own Complaint, and the

14   Ninth Circuit in the *Disabled Rights Action Center* case

15   explained very clearly what the court means when they say

16   whether the party is necessary to accord complete relief.  It

17   means only whether the court can award plaintiff the relief

18   that she is seeking as between the parties that are existing

19   parties to this action.  It does not require the court to

20   consider whether plaintiff can obtain all the relief to which

21   she might theoretically be entitled to against all potential

22   joint tortfeasors under all potential legal theories.

23        It is black-letter law that a plaintiff does not have an

24   obligation to sue all potential joint tortfeasors in this

25   action.  It is possible that Encore might also share some

1   liability, potentially under other statutes.  There is no

2   evidence in the record and plaintiff has no reason to believe

3   that Encore itself is subject to Section 1557 because it does

4   not receive federal financial assistance.

5        But plaintiff, as the master of her Complaint, can choose

6   who she wants to sue, and there are many reasons why employees

7   and their beneficiaries may not want to sue their employers for

8   discrimination, not least of which would be fear of

9   retaliation.

10       Congress enacted Section 1557 to eradicate discrimination

11  in the provision of health insurance and health-related

12  coverage and specifically enacted this statute to ensure that

13  health providers that are federally funded, like Aetna, do not

14  discriminate, both in the design and selling of their plans and

15  also in the administration of their plans.

16       And Aetna cannot hide behind ERISA to shield itself from

17  facing liability for their own actions that it chose to take,

18  both in designing and marketing the plan and also in

19  administering the plan.

20       Plaintiff has alleged that Aetna is responsible for the

21  design.  I know that Your Honor understands that.  But just --

22  not to belabor the point, but had Aetna designed a plan that

23  provided that fertility benefits would only be available to

24  white couples and not mixed-race couples, Aetna could not hide

25  behind ERISA and say that it cannot face Section 1557

1    liability.

2        Even if Encore itself had been the one to design a plan

3    with such a facially discriminatory term, Aetna, as the

4    Administrator, could not say, I cannot face Section 1557

5    liability because of ERISA.

6        Neither ERISA --

7            **THE COURT:**  Right.  I don't think there's -- for

8    purposes of this motion, I don't think they're saying, It

9    should be them not us.  They're saying, It needs to be us --

10   them plus us, and that's the -- that's the call that I'll have

11   to make.

12       I understand your argument on this one.

13           **MS. CHAN:**  I appreciate that, Your Honor.

14       I will note that they did bring this as a 12(b)(7) motion,

15   but in a footnote in their opening brief, they did say,

16   Actually even if Encore can be joined to this case, you should

17   let us out.  They actually were taking the position that, It's

18   not just join them, it's substitute us, let us out of this case

19   because actually under ERISA, we can face no liability under

20   Section 1557.  You have the wrong party.  You should bring --

21   you should dismiss this case and have plaintiff bring a new

22   action solely against Encore.  I believe it's in Footnote 14 of

23   their opening brief where they take that position.

24       But I also want to sort of --

25           **THE COURT:**  That is helpful.  I do understand your

1   arguments on this position.  I really read them carefully.  If

2   you want to take, you know, a minute to wrap up, that would be

3   best, and then I'll give a few minutes for the defendant, and

4   then I've got to take it under submission.

5            MS. CHAN:  I appreciate that, Your Honor.

6        I'll close with just sort of one final point, which is I

7   think that footnote is illuminating because I think it reveals

8   Aetna's true motives in bringing this lawsuit, which are to

9   immunize itself from liability under the guise of Rule 19 and

10  ERISA.  And also they allude to class certification, and I

11  think it is clear that what Aetna is trying to do is

12  essentially eviscerate the Section 1557 protections for the

13  over 100 million people in the United States who are covered by

14  self-funded employer-sponsored health plans, and Aetna is

15  trying to do so by eliminating their ability to enforce their

16  Section 1557 rights collectively by joining together in a

17  common suit to protest a discriminatory plan that has been

18  designed and administered by a single common entity.

19       In this case, it is Aetna who was the sole -- who was

20  responsible both for designing the infertility policy,

21  implementing it, and administering it as part of its

22  off-the-shelf health plans that it markets and sells to

23  consumers, employers nationwide.

24       And it is Aetna's discriminatory conduct that has harmed

25  the plaintiff, and that is why plaintiff is seeking to recover

1   damages and an injunction against Aetna itself.

2           **THE COURT:**  All right.  Thank you.

3           **MS. CHAN:**  Thank you, Your Honor.  I appreciate your

4   time.

5           **THE COURT:**  You're welcome.

6           **MS. VERGOW:**  Your Honor, I'll start with that last

7   point.

8       Aetna's argument here is that the plan sponsor must be

9   joined if they can be, and that's it.  In our opening brief, it

10  wasn't clear to us whether the plaintiff was alleging that she

11  had been denied benefits that were owed under the plan.  She

12  clarified in her opposition that she takes the position that

13  the plan doesn't cover these benefits, and in view of that,

14  it's necessary to add the plan sponsor.

15      And I would just direct the Court to the Ninth Circuit's

16  *Takeda* and *E.E.O.C. vs. Peabody* cases, which I think illuminate

17  the rock-and-a-hard-place position that Aetna is in here.

18      I'll conclude just by returning to the issue of medical

19  necessity very briefly.  In reading plaintiff's Complaint,

20  which I have many times, I did not understand plaintiff to be

21  challenging the basis of the "medical necessity" definition in

22  the plan or to be alleging that that definition deviates from

23  medical standards in a way that leads to the implication that

24  the definition that is in the plan was adopted for

25  discriminatory reasons.  I think I hear that now in plaintiff's

argument, and if that is plaintiff's contention, I think it needs to be pleaded, and we would be very happy to address it if plaintiff feels that she can, consistent with Rule 11, plead it.

But I think we probably taxed Your Honor's patience enough today, and I'll leave it at that.

**THE COURT:**  All right.  Well, as I said, it's an important issue, and so I appreciate the argument from both sides.

I will take the matter under submission and aim to issue a ruling on the motion as soon as I can.

(Proceedings adjourned at 3:16 p.m.)

1

2

3          <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Monday, October 23, 2023

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25